## SHARON *v.* HILL.

*(Circuit Court, D. California.* December 26, 1885.)

1. EQUITY PLEADING—CITIZENSHIP—PLEA IN ABATEMENT.
    Where defendant, in a suit in the circuit court, pleaded in abatement that plaintiff was not a citizen of Nevada, as claimed, but of California, and the plea, being set down for hearing, was overruled, without any evidence being taken, or defendant allowed a day to answer on the merits, this is a proper disposition of the case, and the same defense cannot be again set up.

2. EVIDENCE—PRESUMPTION—FAILURE TO PRODUCE WRITING.
    Where a party willfully refuses to produce a writing which it is sought to annul as a forgery, it will be presumed that its production and examination would show its falsity.

3. WITNESS—CONTRADICTION—IMPEACHMENT.
    Mere variance between the statements of two witnesses will not necessarily impeach or affect the credibility of either of them, as the contradiction may arise from mistake, or other cause consistent with their integrity.

4. CITIZENSHIP—RESIDENCE—FOURTEENTH AMENDMENT.
    The fourteenth amendment does not make a resident in a state a citizen of such state, unless he intends, by residence therein, to become a citizen.

5. ESTOPPEL—RES ADJUDICATA, WHAT IS.
    The parties to a suit in which a question has been determined cannot litigate the same question in another suit, whether instituted before or after the suit in which the matter was determined, or in the same or another court.

6. SAME—JUDGMENT IN CALIFORNIA, WHEN FINAL.
    In California a judgment is not final, and an estoppel against the parties, pending an appeal to the supreme court.

7. SAME—CONSENT TO REMAND OR ASSIGN CASE.
    A consent to remand a case, or assign it for trial before a certain judge, will not prevent the party so consenting from litigating any of the questions involved in another suit.

8. SAME—SUBSEQUENT SUIT IN STATE COURT.
    A suit in a circuit court of the United States will not be stayed until another suit, subsequently brought between the parties, involving some of the same questions, shall have been determined.

9. HUSBAND AND WIFE—MARRIAGE—EVIDENCE—FRAUD—FORGED DECLARATION AND LETTERS—CONDUCT OF WOMAN.
    Evidence examined, and *held* to show letters and alleged secret declaration of marriage to have been forged, and decree of annulment granted.

In Equity.

*W. H. L. Barnes, William M. Stewart, Oliver P. Evans,* and *H. I. Kowalsky,* for plaintiff.

*George W. Tyler, W. B. Tyler,* and *David S. Terry,* for defendant.

Before SAWYER and DEADY, JJ.

DEADY, J.   This suit was commenced on October 3, 1883, to have a certain alleged declaration of marriage between the plaintiff and defendant declared to be false and fraudulent, and delivered up to be canceled and annulled, and to enjoin the defendant from the use thereof.   It is alleged in the bill that the plaintiff is a citizen of Nevada, and the defendant a citizen of California; that the plaintiff has never been the husband of any woman but one, who died in 1875,

v.26F.no.6—22

leaving three children, the issue of said marriage, and that he is possessed of a large fortune, and has a large business and social connection; that the defendant is an unmarried woman, of about 30 years of age, who has resided in the city of San Francisco for some years, and within two months past has publicly claimed and pretended to be the wife of the plaintiff, to whom she alleges she was duly married on August 25, 1880, in San Francisco, by means of a joint declaration of marriage, made in conformity to section 75 of the Civil Code of California; that said claim and pretense are wholly false and untrue, and are made by the defendant for the purpose of obtaining credit and support at the expense of the plaintiff, and to obtain money from him, or, in case of his death, from his heirs, to quiet the same; that the defendant now claims to have said declaration in her possession, but the plaintiff never saw or heard of it until within a month past, and is informed that it is substantially as herein set forth; and that the same is false and forged, and null and void, and ought, as against the plaintiff, to be so declared, and delivered up to be canceled and annulled. On December 3, 1883, the defendant demurred to the bill for want of equity, and on March 3, 1884, the court (SAWYER and SABIN, JJ.) gave judgment overruling the demurrer, on the ground that the instrument, if false or forged, might be hereafter used to maintain a false claim to an interest in the plaintiff's property at a distance of time when the proof of its fraudulent character was unattainable. 10 Sawy. 48, and 20 Fed. Rep. 1.

On April 24, 1884, the defendant pleaded in abatement of the suit: (1) Another suit pending in the superior court of the state, between the same parties, commenced on November 1, 1883, by the defendant for a divorce from a marriage with the plaintiff, by means of said declaration, and the subsequent cohabitation of the parties thereto, until November, 1881, on the ground of adultery and desertion by the plaintiff, which suit was, on November 20, 1883, removed to this court on the petition of the plaintiff, and afterwards, on December 31, 1883, in pursuance of the stipulation of the parties, was remanded to said state court, and that said suit was then on trial therein on the question of whether the plaintiff and defendant are husband and wife, by reason of said declaration and cohabitation; and (2) the court has no jurisdiction of the matters set forth in the bill herein, because the plaintiff is a resident and citizen of California. To this the plaintiff, on May 5, 1884, replied that he ought not to be "barred" from the relief prayed for, by reason of the matters set forth in the plea, and that it is not true that he is a citizen of California. On October 16, 1884, the three months allowed by equity rule 69 for taking evidence on the issue made on the plea having expired, the cause was regularly brought on for hearing on the bill, plea, and replication, when the court (SAWYER, J.) gave judgment for the plaintiff, overruling the plea, with leave to the defendant to answer to the merits within 30 days. The court, after calling attention to the fact

that the plea was bad for duplicity, said, in substance, admitting the allegations concerning the pendency of the suit in the state court, it did not appear that they were for the same purpose or relief; and, if they were, the plea was so far insufficient, because the two suits were pending in courts of different jurisdictions; and, there being no proof in support of any allegation in the plea, it was overruled. 10 Sawy. 394, and 22 Fed. Rep. 28.

On December 30, 1884, the defendant answered the bill, denying that she is an unmarried woman; that the plaintiff is a citizen of Nevada, and averring that he is a citizen of California; that plaintiff never was the husband of any person but his deceased wife, and that he was unmarried at the filing of the bill; that defendant's claim to be the wife of the plaintiff is false, or made for any purpose but to obtain recognition and support as his wife, and admitting that she had made such claim for the past 15 months; that defendant was never the wife of the plaintiff, or that said declaration is null and void or false and forged; and avers that the parties were married on August 25, 1880, and that said declaration is valid and genuine. The answer also contains what is styled therein "a further and separate answer and defense," to the effect that "the plaintiff ought not to be permitted to prosecute this suit," because on August 25, 1880, the parties, by agreement, became husband and wife, and "assumed towards each other that relation," but said marriage not being solemnized as provided in section 70 of the Civil Code of California, the plaintiff and defendant on said day jointly made a declaration of marriage, as set forth in the bill, and thereafter, until November, 1881, cohabited together as husband and wife, when the plaintiff refused to recognize said marriage, and deserted the defendant; that on November 1, 1883, the defendant, as Sarah Althea Sharon, commenced an action against the plaintiff, in the superior court of San Francisco, for divorce, and that "the allegations of marriage in the complaint" therein "were principally founded upon said declaration of marriage." The answer then sets forth *in extenso* the removal of such action to this court, and the remanding of the same, in pursuance of the stipulation as aforesaid, and then proceeds: That by the stipulation of the parties such action was assigned to department 2 of said superior court for trial before a judge thereof, without a jury, and the same was so tried between March 10 and September 17, 1884; that thereafter, on December 24, 1884, said judge found and decided (1) that the parties to such action were, and had been since August 25, 1880, husband and wife; (2) that said declaration of marriage is "true and genuine," and was signed by the defendant therein, and that said parties had cohabited together as husband and wife; and (3) that the defendant had deserted the plaintiff, and the latter was entitled to a divorce and a division of the common property. Wherefore, it is averred that the question of the "genuineness" of said declaration, which is now sought to be tried in this suit, is the same question that

was adjudged and determined in said superior court, and has therefore "become *res adjudicata* as between" the parties hereto.

On January 2, 1885, the general replication was filed to this answer, and on February 5th the defendant filed a supplemental answer, alleging that since the filing of the former answer said superior court had filed its findings and decree, wherein it is adjudged that said declaration is a genuine contract of marriage between the parties hereto, and said parties thereby became husband and wife. Subsequently the defendant in *Sharon* v. *Sharon* duly took an appeal from the judgment therein, and gave notice of a motion for a new trial, both of which proceedings are still pending and undetermined.

The evidence was taken orally before an examiner of the court during the period between February 5 and August 11, 1885, and covers 1,731 pages of legal-cap, written with a type-writer. Besides this, there are a large number of exhibits, consisting of enlarged drawings or tracings of the disputed writings, and particular parts and peculiarities of them, and of the admitted writings of the parties, together with a large number of bank-checks containing the plaintiff's signature; and photographic copies of the declaration; five letters alleged to have been written by the plaintiff to the defendant, and known as the "Dear Wife" letters; a letter from the plaintiff to S. F. Thorn, dated October 16, 1880; four letters written by the defendant to the plaintiff during the years 1881 and 1882; and a letter to the plaintiff written in 1882, and signed "Miss Brackett," besides tracings and other writings of third persons.

The plaintiff having testified on the first day of the examination that the declaration was false and forged, an effort was then made by the plaintiff to have the defendant produce the same before the examiner for inspection by the expert witnesses of the plaintiff, which she evaded doing until February 25th, when she was compelled to do so by the order of the court; and on March 16th, in pursuance of a like order, she produced three of the five "Dear Wife" letters, known as Exhibits 11, 13, and 37, which declaration and letters were examined by Dr. Piper for the plaintiff, and drawings made of the same with the aid of a microscope, from time to time thereafter, in the presence of the examiner, until March 19th, when the defendant, in disregard of the order of the court, and on contumacious, frivolous, and contradictory pretexts, refused to allow a particle of ink to be taken from either of them for examination by the expert under the microscope, so as to ascertain the character and kind of the same, and particularly that used in writing the declaration, which the defendant alleges was written in the plaintiff's office; or to produce said declaration, or any of said five letters, on the hearing in court, for examination by the judges, except the ones known as Exhibits 16 and 37, which were submitted to the court near the close of the hearing for the purpose of determining a comparatively immaterial question relative to the testimony of one of the expert witnesses of the plain-

tiff. Nor did she produce any of such writings before the examiner after March 19th, although their production was thereafter repeatedly and specially demanded by the plaintiff for the inspection of others of his expert witnesses, and particularly to enable counsel effectually to cross-examine the witnesses of the defendant who swore to their genuineness from a private inspection of them, made out of court while they were in her exclusive possession and control. See 10 Sawy. 635, 666, and 23 Fed. Rep. 353. In considering the question of the genuineness of these writings, weight must be given to the fact of the defendant's refusal to submit them to the tests and criticism which he law properly allows, as a means of ascertaining the truth thereabout. 2 Whart. Ev. §§ 1266, 1267. The defendant alleges in her answer that this declaration is genuine, and in her testimony she swears that the letters are of the same character, while on the hearing of the cause she refuses to submit them to the criticism of counsel and the inspection of the court. This singular conduct can only be interpreted as an admission that such inspection would tend to prove their falsity.

Notwithstanding the plea in abatement was overruled, the defendant in her answer formally denies that the plaintiff is a citizen of Nevada, and repeats the allegation that he is a citizen of California; and on the examination took testimony in support thereof, including the cross-examination of the plaintiff; and on the hearing, counsel insisted on again raising the question, and having it determined *de novo*, on the pleadings and testimony now before the court. But the court declined to reconsider the question or to hear argument on the subject, for the following reasons: (1) In the due and orderly course of proceeding in the case, the question was made and disposed of on the plea to the jurisdiction; (2) no attempt was made to obtain a rehearing on the plea, or to take evidence in support of it, but the action of the court in overruling it was acquiesced in, and the case proceeded with on the theory that, for the purposes of this suit, at least in this court, the question of the citizenship of the plaintiff was settled; and (3) because, in my judgment, the ruling and action of the circuit judge in the premises was in all respects legal and right.

But on the argument counsel also called attention to the evidence taken by the defendant on this point, and insisted that the same was contradictory of the plaintiff's testimony, and so far affected his credibility unfavorably. A witness may be discredited by showing that on a former occasion he made a statement inconsistent with his testimony in the case on trial, provided such statement is material. 1 Whart. Ev. § 557. But the contradiction by one witness of the statement of another does not necessarily impeach or affect the credibility of either. The contradiction may arise from mistake, ignorance, want of memory, difference of opinion, or other cause consistent with the integrity of both witnesses. So, in this case, admitting that there are conflicting or contradictory statements in the evidence on the sub-

ject of the plaintiff's citizenship, it does not follow that his testimony is untrue, or that he is at all discredited thereby. Of course, if the court finds that any witness has willfully or even recklessly sworn to an untruth, it will apply the maxim, *falsus in uno, falsus in omnibus,* and treat him accordingly; but the mere fact that the witness is contradicted, does not impeach or discredit him, and the effect may be to discredit the contradicting witness. But there is nothing in the evidence taken by the defendant that contradicts or impugns the statement of the plaintiff that he is and has been a citizen of the state of Nevada since 1864.

"Citizenship" and "residence," as has often been declared by the courts, are not convertible terms. *Parker* v. *Overman,* 18 How. 141; *Robertson* v. *Cease,* 97 U. S. 648; *Grace* v. *American Cent. Ins. Co.,* 109 U. S. 283; S. C. 3 Sup. Ct. Rep. 207; *Prentiss* v. *Barton,* 1 Brock. 389. Citizenship is a *status* or condition, and is the result of both act and intent. An adult person cannot become a citizen of a state by simply intending to, nor does any one become such citizen by mere residence. The residence and the intent must co-exist and correspond; and though, under ordinary circumstances, the former may be sufficient evidence of the latter, it is not conclusive, and the contrary may always be shown; and when the question of citizenship turns on the intention with which a person has resided in a particular state, his own testimony, under ordinary circumstances, is entitled to great weight on the point.

In this case, the plaintiff, admitting his residence in San Francisco for the greater portion of the time for some years before the commencement of this suit, swears that he never intended to become a citizen of California or cease to be a citizen of Nevada. It is admitted that in 1864 he removed from California to Nevada, and became a citizen thereof, and that in 1873 his family, after a short sojourn in Europe, took up their residence in San Francisco; that, in 1875, he was elected United States senator from Nevada, and his wife died, since when he has lived at the Palace, in this city, the greater portion of the time; and that he has large business interests and property in both California and Nevada. But it also appears that in 1880 he was seeking a re-election to the senate from the state of Nevada, and that he has never registered, voted, sought, or held any office, or claimed or exercised any political right or privilege, in this state since his removal to Nevada in 1864. In all these respects his conduct squares with and strongly corroborates his testimony as to the intention with which he had resided in this state. Nor do the statements made by him as a witness in *Boland* v. *Sharon* show anything to the contrary of this. That was a suit in a justice's court in this city, commenced on June 22, 1877, on an open account for brokerage alleged to have been earned by the assignor of Boland, on September 9, 1873. To avoid the defense of the lapse of time there was an allegation in the complaint that Sharon was absent from the

state for more than two years between these dates. On the trial Sharon testified in effect that he was not absent from the state for that time during that period, and judgment was given in his favor. And if Sharon had been a citizen of New York, or an English subject, commorant in San Francisco for the same period, he might truthfully have made the same statement. His citizenship was not involved in the question, and the only matter in dispute was the simple fact whether he was personally present in the state any two years between September 9, 1873 and June 22, 1877, so that he could have been personally served with process therein.

The evidence only proves that the plaintiff was generally an inhabitant of this city for a few years before the commencement of this suit. But when we consider that the plaintiff swears positively that he never intended to become a citizen of this state, and that no act of his while here is inconsistent with such purpose; and when we consider further that Nevada is and has been a favorite mining ground for California capitalists and operators, and that San Francisco is the business and social center of the one state as much as the other, —the mere fact of the plaintiff's bodily presence here, for one or ten years, under the circumstances, is of very little moment in determining his citizenship. Many citizens of Connecticut and New Jersey doubtless do business in New York, the great commercial and social center of that region, and practically reside there, but without becoming citizens of the state, for the reason that they are not there with any such purpose or intention.

Nor, in my judgment, is this well-established rule materially modified by section 1 of the fourteenth amendment, the first clause of which declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." Prior to the adoption of this amendment, strictly speaking, there were no citizens of the United States, but only of some one of them. Congress had the power "to establish an uniform rule of naturalization," but not the power to make a naturalized alien a citizen of any state. But the states generally provided that such persons might, on sufficient residence therein, become citizens thereof, and then the courts held, *ab convenienti*, rather than otherwise, that they became *ipso facto* citizens of the United States. Story, Cont. § 1693; *Prentiss* v. *Barton*, 1 Brock. 391. But the amendment declares the law positively on the subject, and reverses this order of procedure, by making citizenship of a state consequent on citizenship of the United States; for, having declared what persons are citizens of the United States, it does not stop there, and leave it in the power of a state to exclude any such person who may reside therein from its citizenship, but adds, "and such persons shall also be citizens of the state wherein they reside." But, certainly, it was not the intention of the amendment to make any citizen of the United States a citizen of any par-

ticular state against his will, in which the exigencies of his business, his social relations or obligations, or other cause, might require his presence for a greater or less length of time, without any intention on his part to become such citizen.

The better opinion seems to be that a citizen of the United States is, under the amendment, *prima facie* a citizen of the state wherein he resides, and cannot arbitrarily be excluded therefrom by such state, but that he does not become a citizen of the state against his will, and contrary to his purpose and intention to retain an already acquired citizenship elsewhere. The amendment is a restraint on the power of the state, but not on the right of the person to choose and maintain his citizenship or domicile; but it protects him in the exercise of that right by making him a citizen of that state in which he may choose to reside with such intention. In *Robertson* v. *Cease*, 97 U. S. 648, the court held that, for the purpose of giving jurisdiction to the circuit court, an allegation that a party is a resident of a particular state is not equivalent to an allegation that he is a citizen thereof, for the reason, as suggested by Mr. Justice HARLAN, that, even under the amendment, mere residence in a state does not necessarily or conclusively prove one to be a citizen thereof. And if an allegation of residence in a state is not necessarily, even under the amendment, the equivalent of an allegation of citizenship, then the mere fact of residence in a state is not necessarily the equivalent of citizenship.

One other question remains to be disposed of before passing to the consideration of the genuineness of the alleged declaration of marriage, and that is the effect of the finding and adjudication of the superior court in *Sharon* v. *Sharon*. At the first blush I was of the impression that this suit having been first commenced, neither the right to maintain it, nor the determination of any question involved therein, could be affected by any finding or judgment in the case of *Sharon* v. *Sharon*. But on further reflection and examination of the authorities I am satisfied that the law is otherwise as to the effect of the finding or judgment. It matters not in which suit the subject of the controversy or any question involved therein is first determined, the result may be set up as a bar or estoppel, as the case may be, against the further litigation of the same matter in the other. The maxim, *interest reipublicæ ut sit finis litium,* equally applies. See *Bellinger* v. *Craigue*, 31 Barb. 534; *Gates* v. *Preston*, 41 N. Y. 113; *Casebeer* v. *Mowry*, 55 Pa. St. 419.

A judgment on the merits in an action on a claim or demand is a bar to another action thereon between the same parties or their privies, and concludes them as to all matters which appear on the face of the judgment to have been determined, or which were actually and necessarily included therein, or necessary thereto. Code Civ. Proc. § 1911; but where the actions are not on the same claim or demand, a judgment in the one is only an estoppel in the other as to a matter in-

volved therein and actually found and determined thereby. *Outram* v. *Morewood*, 3 East, 346; *Cromwell* v. *County of Sac*, 94 U. S. 351; *Davis* v. *Brown*, Id. 427.

This suit and the action of *Sharon* v. *Sharon* are not brought on the same claim or demand. The subject-matter and the relief sought are not identical. This suit is brought to cancel and annul an alleged false and forged writing, and enjoin the use of it by the defendant to the prejudice and injury of the plaintiff, while the other is brought to establish the validity of said writing as a declaration of marriage, as well as the marriage itself, and also to procure a dissolution thereof, and for a division of the common property, and for alimony. But the validity and genuineness of this declaration of marriage were directly involved in the action of *Sharon* v. *Sharon*, and determined in favor of 'the same by the finding and judgment therein. The plaintiff is therefore estopped to show the contrary in this suit, unless the effect of that judgment, as an estoppel in this case, has been obviated by the appeal therefrom to the supreme court, and the pending motion for a new trial.

There is some confusion and contradiction in the language and ruling of the authorities on this point. But this arises largely from the fact that the difference in the original mode and effect of reviewing a judgment in an action at law, and the decree of a court proceeding according to the civil law, as a court of chancery or admiralty, is often, latterly, overlooked. A judgment in an action at law could only be reversed and annulled for error appearing on its face. For this purpose a writ of error issued out of the court above, to bring up the record for examination. This was considered a new action to annul and set aside the judgment of the court below; and if the writ was seasonably sued out and bail put into the action, it was a *supersedeas*, so far as to prevent an execution from issuing on the judgment, pending the writ of error, but left it otherwise in full force between the parties, either as a ground of action, a bar, or an estoppel. 2 Bac. Abr. 87; 3 Black, 406; *Railway Co.* v. *Twombly*, 100 U. S. 81. But in the equity and admiralty courts the remedy for an erroneous decree is an appeal, which removes the whole case into the court above, for trial *de novo*. There is no decree left in the lower court, and, pending the hearing on appeal, there is no decree in the case, and there can be no estoppel by reason thereof. The tendency during the past half century has been to assimilate proceedings in equity and law cases, and in the states where the modern code prevails, the proceeding by which a judgment is reviewed in the appellate court is generally known as an appeal, although in effect it is more like a writ of error than an appeal.

In this condition of things, the courts of some of the states have held that the effect of an appeal in any case is to suspend the judgment appealed from for all purposes; and that, pending the appeal, or during the time in which one may be taken, the judgment is neither

a bar nor an estoppel.   In others, the courts have regarded the appeal, in cases where the power of the apellate court is confined to the affirmation, modification, or reversal of the judgment, according to the facts found or the things done, as appears from the record, as a mere proceeding for the correction of errors, and have therefore held that the judgment of the court below is in the mean time in full force as a bar or estoppel.   Such was the ruling in *Bank of North America* v. *Wheeler*, 28 Conn. 433, in which the court said:

"If the appeal is in the nature of a writ of error, and only carries up the case to the court of appeals as an appellate court for the correction of errors which may have intervened in the trial of the case in the court below, and for its adjudication upon the question whether the judgment appealed from should be affirmed, reversed, or modified, and that court has no other powers or duties than to affirm, reverse, or modify that judgment, or remit the case to the inferior tribunal that it may conform its judgment to that of the appellate tribunal, then such appeal   *   *   *   does not vacate or suspend the judgment appealed from; and the removal of the case to the appellate court would no more bar an action on the judgment than the pendency of a writ of error at common law, when that was the proper mode of correcting errors which may have occurred in the inferior tribunal.   That such an action would not be bound by the pendency of such a proceeding is well settled.   The judgment below is only voidable."

This case is cited and followed in *Rogers* v. *Hatch*, 8 Nev. 35, and *Cain* v. *Williams*, 16 Nev. 426.   But the law of California on this subject is the law by which this court must be governed.   By the act of 1790, (1 St. 122; Rev. St. § 905,) congress provided that "the records and judicial proceedings" of the state courts "shall have such faith and credit given to them in every court within the United States as they have by law or usage in the courts of the state from which they are taken."

The judgment in *Sharon* v. *Sharon* can have no other effect in this court, as an estoppel, than it would have in a court of the state under like circumstances.   *Mills* v. *Duryee*, 7 Cranch, 481; *Hampton* v. *McConnel*, 3 Wheat. 234; *Thompson* v. *Whitman*, 18 Wall. 457; Bigelow, Estop. 29, note 1.   By section 946 of the Code of Civil Procedure, it is provided that an appeal "stays all further proceedings in the court below on the judgment   *   *   *   appealed from."   This, in effect, makes the appeal, like a writ of error, a *supersedeas*, and prevents the enforcement of the judgment by execution, pending the appeal, but nothing more.   But section 1049 of the Code goes further, and provides: "An action is deemed to be pending from the time of its commencement until its final determination upon appeal, or until after the time for an appeal has passed, unless the judgment is sooner satisfied."   The effect of this provision appears to be that the judgment in the court below is only a step in the proceeding to a final judgment in the appellate court in case of an appeal, and otherwise to hold it in suspense as a ground of action or defense in another suit, until the time for taking an appeal has passed.

But these provisions of the Code are merely the codification of the

law as declared by the supreme court of the state under the old practice act, according to which an appeal from a judgment not only stays its execution, but suspends its operation for all purposes. See *Knowles* v. *Inches*, 12 Cal. 215; *Woodbury* v. *Bowman*, 13 Cal. 634; *McGarrahan* v. *Maxwell*, 28 Cal. 91; Freem. Judgm. § 328. And in *Murray* v. *Green*, 64 Cal. 369, this rule has been followed since the enactment of the Code. In the leading case of *Woodbury* v. *Bowman*, which is cited and followed in the latest one, (*Murray* v. *Green*,) the opinion of the court was delivered by the senior counsel for the defendant. In speaking of the rejection of a judgment roll in a case then pending on appeal, when offered in evidence in the case under consideration, he says: "We think it was properly rejected. The appeal having suspended the operation of the judgment for all purposes, it was not evidence in the question at issue, even between the parties to it." It follows that the plaintiff is not estopped by the finding and judgment of the superior court in *Sharon* v. *Sharon*, to allege and prove in this case that the declaration of marriage is false and forged.

The junior counsel for the defendant made the point on the argument that the plaintiff was in some way estopped to try this question in this case or in this court, because, forsooth, he had consented that the case of *Sharon* v. *Sharon* might be remanded to the superior court, and also that it might be assigned to a particular department thereof, and tried by a particular judge therein, without jury. But how such a simple matter could have such a serious effect is not apparent, and counsel does not make it so; and, certainly, a mere consent to a matter of procedure in a case cannot have the effect to bind the party thereto never to litigate any question involved therein in any other case or court. As a matter of public policy, founded on a sense of justice and convenience, a party is bound by the result of litigation to which he is a party, and not because any of the intermediate steps in the proceeding, as the number of the jury or the judge before whom it was tried, were taken with his consent; and, indeed, a judgment by consent is no more binding on the defendant than one regularly obtained against his will. Consent to the entry of a judgment, or any step leading thereto, gives no peculiar or additional force or effect to the result. It is still a judgment, and nothing more.

This disposes of all the collateral and preliminary questions made on the argument by counsel for the defendant, except an objection to sundry portions of the plaintiff's evidence for irrelevancy, which needs no special notice.

Is the alleged declaration of marriage a genuine instrument, or a false and forged one? is the principal question in this case; and I proceed to dispose of it as briefly as possible. Closely related to this, however, is the question of the genuineness of the five "Dear Wife" letters. Originally, they all came from the possession of the defendant, and if either the declaration or the letters appear genuine it is a

convincing circumstance in favor of the other, and *vice versa*. The evidence on this point includes the testimony of experts in handwriting, persons more or less familiar with the plaintiff's writing, witnesses to the existence of the declaration and letters as far back as the fall of 1881, the acts and declarations of the parties during the alleged existence of these documents, and their testimony given in this case.

Many of the witnesses testified in the case of *Sharon* v. *Sharon*, and some of them were cross-examined at great length concerning the testimony they gave there. Some of the collateral matters that were prominent topics in that case were omitted in this; for instance, the grave-yard charm, the visits to fortune tellers to get devices to influence the affections of the plaintiff to the defendant, and practices resorted to by her to that end. Nor was there any evidence in the case tending to show that the plaintiff ever introduced the defendant to any member of his family, or that she was present at the reception given at Belmont by the plaintiff to his daughter Flora, on the occasion of her marriage with Sir Thomas Hesketh; nor did the plaintiff testify as to the nature of his relation with the defendant, further than to deny the genuineness of the declaration, or that she was ever his wife, or ever recognized as such in any way or at any time.

I have carefully considered all the evidence, but it is unnecessary, if not impossible, to speak of it in detail. And, *first*, the undisputed and undoubted facts of the case are briefly these: The plaintiff is and has been for years a prominent and well-known person on this coast. He was born in 1821, and came to California in 1849, and has been in business in this state and Nevada ever since, where he has acquired a fortune that he modestly estimates at $5,000,000. Early in the 50's he married Miss Mary Ann Malloy, in this city. She died in 1875, leaving a son and two daughters, one of whom has since died, leaving three children, and the other is married in England, and the mother of two children. The son is living, and 29 years of age. Since the death of his wife the plaintiff has lived ostensibly as a widower, in rooms at the Palace, of which he is the proprietor. He is considered a shrewd, active, intelligent, and courageous man of the world, with a liking for public affairs, and between 1875 and 1881 was United States senator from Nevada. In his composition there appears to be a vein of sentiment and love of pleasure that has led him into illicit relations with the other sex, and given him the reputation of a libertine.

The defendant appears to be an attractive woman of about 32 years of age, but she is not certain as to the year of her birth. She was born in Missouri, and lost her parents, as I infer, when she was quite young. She went to school at a convent for some time, but she cannot state how long. She came to this state in 1871, where she has relatives, with her brother, and lived with them for eighteen months or two years. From 1873 to 1775 she lived at the Grand Hotel with

her brother, after which she lived some time with a relative. Then she kept house for a time with her brother, when she returned to the Grand, where she remained until the opening of the Baldwin, in 1877, when she removed thither. In the spring of 1880 she went to live at the Galindo Hotel, in Oakland, and returned to the Baldwin after the burning of the Galindo, early in September of the same year, but removed to the Grand about the last of the same month, where she remained until December 6, 1881, when she was expelled therefrom by order of the plaintiff. The Grand has been owned by the plaintiff since prior to 1880, and is connected with the Palace by a bridge across the street which separates them.

Not much light is thrown by the evidence upon the defendant's occupation or associations during these 10 years. She appears to have received some thousands of dollars from her guardian in Missouri, which I infer came from her mother's estate. Between 1878 and 1880 she was engaged in stock speculations. In 1878–79 her account at the Bank of California showed cash deposits to her credit of over $16,000, of which sum only $11 was left to her credit in February, 1880, and she owed a bill at the Baldwin of $339. During the latter part of this 10 years she had a serious love affair with a prominent lawyer of San Francisco, which culminated on May 10, 1880, in an attempt to commit suicide in his office by taking poison, from the fatal effect of which she was only saved by the prompt use of the stomach-pump.

Some time in 1880, and after May 10th, she made the acquaintance of the plaintiff in some casual way on the street or in the Bank of California, as a large stock dealer, which resulted in his calling on her at the Baldwin, and she calling at his office over the bank, though it is not at all certain, even from the testimony of the defendant, which called first. On September 25, 1880, the plaintiff sent her a note from the Palace to the Baldwin asking for a meeting with her elsewhere than at the latter place. So far as appears, this is the first written communication that ever passed between the parties; and she swears that the plaintiff sent her two other notes of like import on the same day. The following is a copy of the only one produced:

[Exhibit 21.]

"SAN FRANCISCO, September 25, 1880.

"*My Dear Miss Hill:* Can you meet me this evening, say about five o'clock, in the parlors of the Grand Hotel? Something I want to tell you of interest to yourself. Will not do to meet you at the Baldwin; so, if you cannot see me at the Grand, name place and hour.

"Very truly, WM. SHARON."

On September 29th the defendant, at the request of the plaintiff, went to the Grand to live, where she was known as Miss Hill, the plaintiff paying her a stipend of about $500 a month, and allowing her to visit his rooms in the Palace privately, and occasionally inviting her there to take a meal with him. On December 5, 1880, the

defendant wrote and the plaintiff signed and delivered to her an agreement, of which the following is a copy: "100 shares of Belcher, held for Miss Hill, at 200 dollars a share, to be paid on delivery. W. SHARON. December 5, 1880." Some time in the fall of 1881 the plaintiff accused the defendant of purloining some of his Belcher mine papers, and revealing his business secrets and private affairs to other persons, which she denied at the time, but now admits that after she left the Grand she found the papers in one of her trunks, and that she has not returned them. For this and other reasons, the plaintiff appears to have been desirous of terminating his relations with the defendant; and accordingly, on November 7th, he effected an arrangement with her by which, in consideration of a receipt in full of all demands, and a promise not to trouble him any more, he gave her the sum of $7,500, as follows: Cash, $3,000; by note payable August 1, 1882, $1,500; and by an agreement to pay her $250 a month during the year 1883.

On November 19th, the business manager of the Grand Hotel, by direction of the plaintiff, sent the defendant the following note:

"*Miss S. A. Hill*—DEAR MADAM: As we wish to otherwise occupy room 208 on December 1st, prox., you will please select another residence, and give up possession on that date, and much oblige
     "Yours,                              S. F. THORN."

The defendant did not vacate the room as required, and on December 5th the door was taken off the hinges; but at her request she was permitted to stay until the next morning, when, still not making any movement to leave, the carpets were taken up, and she was informed by the servants that if she did not go they had orders to put her out, and she left on the evening of December 6th. Between the time of receiving the notice to quit and her final departure from the hotel the defendant wrote three letters to the plaintiff, of which the following are copies:

"*Mr. Sharon:* I received a letter from Mr. Thorn in regard to my room. Of course I understand it is written by your orders, for no human being can *say aught of* me except with regard to yourself. Now, Mr. Sharon, you are wronging me; so help me God, you are wronging me. I am no more guilty of what you have accused me than some one who never saw you; and would you, who wished me to come to this house, whom I have been up with nights, and waited on and cared for, and would have done anything to help you, be the one to wrong and injure me?— a man whom the people have placed enough confidence in his honor to put him in the United States senate, to *stoop to injure a girl, and one whom he has professed to love!*"

"*My Dear Mr. Sharon:* I cannot see how you can have any one treat me so,—I, who have always been so good and kind to you. The carpet is all taken up in my hall. The door is taken off and away, and it does seem to me terrible that it is you who would have it done. I met Mr. Thorn in the hall as I started to come over to see you, and asked him if he had ordered such a thing done, and he said that I must move out; that it was your wish. I told him that I had written you a note, when I received yours, and told you if you wished me to go, to send me word, for it was not *convenient* to get the

place I wanted until some time this month. He said that you had told him to see that I went, so I said no more, but came over to see you. Oh, senator, dear senator, don't treat me so! Whilst every one else is so happy for Christmas, don't try to make mine so miserable. Remember this time last year. You have always been so good; you don't act so. Now let me see you and talk to you. Let me come in after Ki has gone, if you wish, and be to me the same senator again. Don't be cross to me; please don't. Or may I see you, if only for a few minutes? Be reasonable with me, and don't be unjust. You know you are all I have in the world, and a year ago you asked me to come to the Grand. Don't do things now that will make *talk*. You know you can find no fault with me. May I see you for a few minutes? and let us talk reasonably about all this. I know you will. I know it is not in your nature to be so hard to one that has been so much to you, and don't be unjust. Say I may see you."

"*My Dear Mr. Sharon:* I have written you two letters, and received no reply, excepting to hear that they have been read and commented upon by others than yourself. I also heard you said you were told that I said I could and would give you trouble. Be too much of a man to listen to such talk, or allow it to give you one moment's thought. I have never said such a thing, nor have I had such a thought. If no woman ever makes you any trouble until I do you will go down to your grave without the slightest care. *No, Mr. Sharon, you have been kind to me. I have said I hoped my God would forsake me when I ceased to show my gratitude.* I repeat it. I would not harm one hair of your dear old head, or have you turn one restless night upon your pillow through any act of mine. If you are laboring under a mistake, and not bringing the accusation for the purpose of quarreling with me, the time will come when you will find out how you have wronged me; and I believe you too much of a man at heart not to send for me and acknowledge it to me. But in your anger you are going to the extreme; I mean by calling Thorn, or any of your relatives, or outsiders, and letting them know your anger. It simply gives them an opportunity of saying ill-natured things of me, which are unnecessary. Mr. Sharon, I have never wronged you by word or act; and were I to stay in this house for a thousand years I would never go near your door again until you felt willing to say to me you knew you had spoken unjustly to me. You once said to me there was no woman who could look you in the face and say: ' William Sharon, you have wronged me.' If that be the case, don't let me be the first to utter the cry. I had hoped to always have your *friendship* and best will throughout life, and always have your good advice to guide me, and this unexpected outburst and uncalled for action was undeserved. If you would only look at how absurd and how ridiculous the whole thing is, you surely would act with more wisdom. Why should I do such a thing? What have I to gain by doing so? Pray give me credit for some little sense. I valued your *friendship* more than all the world. Have I not given up everything and everybody for it? One million dollars would not have tempted me to have risked its loss. I feel humiliated to death that Thorn, or any one, should have it to say I was ordered out of the house. I have a world of pride, and I ask you to at least show me the respect to let Thorn have nothing more to do or say in the affair. I have always been kind to you, and tried to do whatever I could to please you; and I hope, at least, in your unjust anger you will let us *apparently part friends;* and don't do or say anything that could create or make any *gossip.* Think how you would like one of your daughters treated so. If you have any orders to give, or wish to, make them known in any other way than through your servants or through Thorn. Don't fight me. I have no desire or wish to in any way be unkind to you. I have said nothing to any one about the letter I have received, nor do I even wish to speak to Thorn on the

subject. You have placed me in a strange position, senator, and all the pride in me rebels against speaking upon the subject.

"As ever,                                                                                A."

To these letters the plaintiff vouchsafed no answer.

During the defendant's residence in the Grand the plaintiff was often absent from the city, and in the early part of 1881 was in Washington city some months; and it was not generally known or understood among the servants and guests of the hotel that she frequented the plaintiff's rooms, or that she remained there at night. The plaintiff admits that in the fall of 1881 she secreted herself in the plaintiff's rooms and witnessed him and a woman undress and go to bed together, and that she related the adventure to the seamstress of the hotel and others, with laughter, as something very funny. When the defendant left the Grand she remained in San Francisco, going first to the house of a negro woman, on Mary street, Martha Wilson, and afterwards keeping house, and then boarding at several places. The plaintiff never visited the defendant after she left the hotel, but in the summer of 1882 she appears to have visited him at the Palace; and in August of that year she wrote him a letter, of which the following is a copy:

"*My Dear Senator:* Won't you try and find out what springs those were you were trying to think of to-day, that you said Mr. Main went to, and let me know to-morrow when I see you? And don't I wish you would make up your mind and go down to them with Nellie and I, wherever they be, on Friday or Saturday. We all could have such nice times out hunting and walking or driving these lovely days, in the country. The jaunt or little recreation would do you worlds of good, and *us girls* would take the best of care of you, and mind you in everything. I wish we were with you this evening, or you were out here. I am crazy to see Nell try and swallow an *egg in champagne.* I have not told her of the feat I accomplished in that line, but I am just waiting in hopes of seeing her some day go through the performance. As I told you to-day, I am out to Nellie's mother's for a few days, 824 Ellis street. What a lovely evening this is, and how I wish you would surprise us two *little lone birds* by coming out and taking us for a moonlight drive. But gracious me, it's too nice to think of; but I really wish you would. 'Twould do you good to get out of that stupid old hotel for a little while, and we'd do our best to make you forget all your business cares and go home feeling happy.                                                        A."

Early in 1883 she went to the Palace to visit the plaintiff, taking with her Nellie Brackett, the "Nellie" of the foregoing letter, a young girl whom she had had about her since the summer of 1882 as a sort of dependent companion; but she was expelled therefrom by his order. Soon after, Nellie Brackett wrote and sent a letter to the plaintiff, which she swears she wrote at the defendant's dictation; but the latter says Nellie wrote it "out of her own head," and then told her of it. The following is a copy of the letter:

"*Old Sharon:* When I first met you I felt quite honored to think I had on my list of acquaintances a United States senator, but to-day I feel it a double disgrace to know you. If you are a specimen of the men that are honored by

the title of rulers of our country, then I must say that I pity America; for a bigger coward or upstart of a gentleman never existed, in my opinion, since last Thursday night. I was present with the lady who called on you; and to think of what a coward you must be! Your own conscience would not allow you to see her and politely excuse yourself, but you must send one of your Irish hirelings to do your dirty work. I hope God will punish you with the deepest kind of sorrow, and make your old heart ache and your old head bend. I am one not to wish evil to people generally, but with all my heart I wish it to you. You did her a mean, dirty trick, and tried in every way to disgrace her,—a motherless, fatherless girl,—because you knew she leaned on you, and was alone in the world; and a few weeks after God took from you your much loved daughter. Be careful that, after this disgraceful outrage of Thursday night upon her, God does not again bring you to grief, or some great misfortune. I hope he will; I hope he will. Instead of trying to hold her up in the world, you have tried every way in the world you can to disgrace her. I should think you would be so ashamed of yourself that you couldn't do enough to atone for the wrong you have done her. I love her, and I just hate you. It is well I am not her, or I would advertise you from one end of the world to the other. But she feels herself so much of a lady that she too tamely submits to your insults. Why, you are not good enough for me to wipe my shoes on, much less her. If you knew how insignificant you looked to-day,—although I, a poor girl, and you could ride in your carriage. I feel really so much above you that I ask Mr. Dobinson to take my message rather than come in contact with yourself.

"The message of insult which you returned to me by Mr. Dobinson was so farcical that I had to laugh in Mr. Dobinson's face, and ask: 'Don't you think that man crazy?' I am a poor girl, but I feel myself so much better than you—you horrible, horrible man.          MISS BRACKETT."

No further intercourse or communication is known to have taken place between the parties, and no public declaration or claim concerning the alleged marriage was made, until September 8, 1883, when one William Neilson procured the arrest of the plaintiff on the charge of adultery, alleging that he was the husband of the defendant; and soon after published a "Dear Wife" letter, the original of which has never been produced, and also the alleged declaration of marriage, to cancel which this suit was thereupon brought.

The defendant's account of the execution of the declaration of marriage, and the intercourse between herself and the plaintiff, which preceded it, is substantially as follows: In the summer of 1880, and before August 25th, by invitation of the plaintiff, she visited him to get points on stocks. During one of these visits the plaintiff proposed to give her $500 a month to let him "love her;" in other words, to be his mistress. She declined the offer, and he raised the sum to $1,000, which she also declined, saying: "You are mistaken in the woman. You can get plenty of women that will let you love them for less than that." With that she rose to depart, saying she would not come any more, when the plaintiff put his back against the door, and said she was mistaken; that he was really in love with her, and wanted to marry her; when she replied: "If that is what you want we will talk about that." Nothing more of any moment occurred on this occasion, but whether it was a day or a month before August 25th

she is unable to say. However, on that day, she returned to the plaintiff's office, and accepted his proposition of marriage, without any further preliminaries. Then the question arose as to how they should be married. He wanted the marriage secret, as he had a *liaison* on hand with a woman in Philadelphia, who would make trouble if she heard of it, which might injure his chances for a re-election to the senate from Nevada; and said that under the Civil Code they could marry themselves privately, by the execution of a writing to that effect, to which she appears to have readily assented. Thereupon, at his suggestion, she sat down at his table, and wrote at his dictation, and at one sitting, the alleged declaration of marriage, which he then signed and returned to her, whereupon, without any more ado, they quietly separated, she going to her lodgings at the Galindo Hotel, and he to Virginia, Nevada, where he remained some weeks, without any communication passing between them, until very shortly before the letter of September 25th, which he addressed to her at the Baldwin; that soon after the receipt of this letter she removed, at the request of the plaintiff, from the Baldwin to the Grand, and continued to live there in room 208, until December, 1881, during which period she was in the habit of visiting the plaintiff in his rooms at the Palace, day and night, and received from him the sum of $500 a month, with which to pay her bills.

On the other hand, the plaintiff swears positively that he never signed the declaration of marriage; that he never saw or heard of it until it was made public in September, 1883; that he was never married to the defendant in any way; that he never addressed her as his wife, in writing or otherwise; and that he never knew or heard that she made any claim to be his wife until that time.

The originals of the declaration and "Dear Wife" and other letters written by the plaintiff to the defendant not being in his possession, and she refusing to produce them and put them in evidence, he was allowed to put in evidence photographic copies thereof, made from the originals when introduced by her in *Sharon* v. *Sharon*. The copies of the letters were put in evidence, against the objection of the defendant, for the purpose of showing that the correspondence between the parties was not such as would naturally pass between husband and wife; and, further, for the purpose of showing that the defendant had been guilty of forgery, by changing the address of five of these letters from "My Dear Allie" or "Miss Hill" to "My Dear Wife," for the purpose of supporting and strengthening her claim that the declaration of marriage is genuine, and was signed by the plaintiff.

The declaration is in the words and figures following:

"In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Sarah Althea Hill, of the city and county of San Francisco, state of California, age 27 years, do here, in the presence of Almighty God, take Senator William Sharon, of the state of

Nevada, to be my lawful and wedded husband, and do here acknowledge and declare myself to be the wife of Senator William Sharon, of the state of Nevada.                                   SARAH ALTHEA HILL.

"AUGUST 25, 1880, SAN FRANCISCO, CAL.

"I agree not to make known the contents of this paper or its existence for two years, unless Mr. Sharon himself see fit to make it known.
                                                                  "S. A. HILL.

"In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Senator William Sharon, of the state of Nevada, age 60 years, do here, in the presence of Almighty God, take Sarah Althea Hill, of the city of San Francisco, Cal., to be my lawful and wedded wife, and do here acknowledge myself to be the husband of Sarah Althea Hill.                                        WM. SHARON.
"*Nevada, Aug.* 25, 1880."

The following are copies of the five "Dear Wife" letters, the one in ink being first, with the letter to Thorn, referred to therein:

[Exhibit 13.]

"*My Dear Wife:* In reply to your kind letter, I have written Mr. Thorn, and inclosed same to you, which you can read, and then send it to him in an envelope, and he will not know that you have seen it.   Sorry that anything should occur to annoy you, and think the letter will command the *kind courtesy* you deserve.   Am having a very lively and hard fight, but think I shall be victorious in the end.   With kindest consideration, believe me,
                                                               "WM. SHARON."

[Exhibit 38.]

"AGENCY OF THE BANK OF CALIFORNIA.

                                        "VIRGINIA, NEV., October 16, 1880.

"*Mr. Thorn*—MY DEAR SIR: I gave Miss Hill a note to you, and expected the kind consideration for her which she deserves.   But it seems you have not been as accomodating as you might be.   You will consider my wishes in this, and allow no cause of complaint.
    "Very truly,                                             WM. SHARON."

[Exhibit 29.]

"*My Dear Wife:* Inclosed send you by Ki the balance, two hundred and fifty, which I hope will make you happy.   Will call this evening for the joke.
    "Yours,                                                              S.
"*April* 1, [1881.]"

[Exhibit 11.]

"*My Dear Wife:* You have had one hundred and twenty.   Then twenty, and before I left one hundred.   In all, two hundred and forty, (240.)   The balance is just two hundred and sixty, for which find cash inclosed.   I am afraid you are getting extravagant.                             SHARON.
"*May* 5, 1881."

[Exhibit 16.]

"*My Dear Wife:* Inclosed find three hundred and ten dollars to pay bills with, etc.                                                        W. S.
"*August* 29, 1881."

[Exhibit 37.]

"PALACE HOTEL, SAN FRANCISCO, October 3, 1881.

"*My Dear Wife:* Inclosed find five hundred and fifty dollars, which will pay expenses until I get better.   Will then talk about your eastern trip.   Am much better to-day.   Hope to be up in three or four days.   Truly,     S."

The following are copies of the three other letters in pencil. The first was written near Christmas, 1880, and the other two in the spring of 1881:

"*My Dear Allie:* Come over and join me in a nice bottle of champagne, and let us be gay before Christmas.                                                   W. S.

"If you don't come over and take part in the bottle, I may hurt myself."

"PALACE HOTEL, SAN FRANCISCO, 188—.

"*My Dear A.:* Come and take dinner. Answer."

"*Miss H.:* Have ordered a nice dinner, and have a sample bottle of wine want you to try."

Eight witnesses were examined as to the genuineness of the signature to the declaration and the "Dear Wife" letters. Three of these —Mr. C. D. Cushman, Mr. Samuel Soule, and Mr. M. Gumpel—were called by the defendant.

Cushman did not speak as an expert, but simply as one having a knowledge of the plaintiff's handwriting, obtained during some years spent in his employ. His general standing and character are not questioned, but it is claimed, and apparently with good reason, that for some cause he has made himself a very bitter partisan, in this case, of the defendant, from the time it was mooted.

Soule is 78 years of age, and professed to speak as an expert, or a "judge of handwriting," on very slender grounds. His opinion is based on a comparison made out of court with writings not produced or admitted to be the plaintiff's. Both he and Cushman, on these grounds, testify that the writings in question are genuine, but in my judgment very little weight ought to be given to the opinion of either of them.

Gumpel is a lithographer, and an expert of considerable experience, besides being in some respects a very remarkable penman. But his relation to the case, and his conduct as a witness therein, are both suspicious and unsatisfactory, and lead me to regard him and his testimony with distrust. On October 16, 1883, he writes to the attorney of the plaintiff, Mr. Barnes, suggesting that the other side wished to retain him as an expert, but he preferred to be employed by Mr. Barnes, and is anxious to know if he wants him. Afterwards he was retained by the plaintiff as an expert, and examined the disputed writings, prior to the trial of *Sharon* v. *Sharon*, so far as he had an opportunity. On the trial of that case he was not called as a witness by the plaintiff, because, as he says, he had told Mr. Barnes he could do him no good. Thereafter, according to his statement, he met the defendant's attorney, Mr. Tyler, on the street, with whom he had not spoken for two years, and against whom he had "a great grudge" on account of some former "bad" treatment, who immediately ran up to him, begged his pardon for the past, and asked him to be a witness on his side of the case. To this the witness replied,

"I think you have a great deal of audacity to speak to me;" and, after some further parley, said: "You know how to secure the attendance of a witness;" and added, "If you subpœna me in this case, I give you due warning that I will bust your case higher than a kite; look out!" Notwithstanding this friendly warning, which looks as if it was given and received in a Pickwickian sense, Mr. Tyler had the witness subpœnaed, and he went upon the stand and swore that the signature to the declaration was genuine, and that the "Dear Wife" letters were written by the plaintiff, and were not tracings, which testimony he repeated in this case. On his examination in chief the witness was very confident that he could detect any tracings,—said he had done so "at the first glance" in the case of *Treadwell* v. *Bank of California*,—but on being asked on cross-examination to say which of plaintiff's exhibits, 200 and 201, was the tracing, and which was the original,—the one being a letter written by the plaintiff on January 5, 1885, to an expert witness, and the other a tracing thereof, made by the latter,—he sulked and would not answer. Said he would if he had a month to examine them in, and the plaintiff would pay him for his time. His opinions on the subject of the writings are mere bald assertions, unsupported by any intelligent or convincing reasons. He first pretended that his "method" was a secret, and spoke of it as something unusual and even occult, that he could not explain. But afterwards he was compelled to admit that he had no special "method," but simply compared the one writing with another, and came to a conclusion, from their resemblance or dissimilarity, whether they were written by the same person or not. I repeat that I am constrained to regard his connection with the case with suspicion, and his testimony as unsatisfactory, and with distrust. The possibility of his having written the disputed signature himself will be considered further on.

Of the five witnesses called by the plaintiff on this point, Dr. R. M. Piper is the most important. He appears from his own account, and this is corroborated by the work he has done in this case, to be an expert of celebrity, and a microscopist of experience and distinction. After the trial of *Sharon* v. *Sharon* he was employed by the plaintiff to come here from Chicago, and give his time and attention to the examination of the writings in this case, without any understanding as to the amount of his compensation, except that it should be satisfactory to him. This circumstance has been animadverted on by counsel, and in considering the credit due to his testimony it cannot be overlooked by the court. Upon this arrangement his compensation may be, and in some degree probably is, contingent upon success. But there is nothing very unusual in this; and until experts are nominated by the court and paid by the state, the circumstance of their being retained by the parties must always be considered in estimating the value of their evidence. And in this connection it may also be noticed that Dr. Piper, being a comparative stranger

here, was, on cross-examination, very properly asked concerning the antecedent circumstances of his life, and that for some reason he failed to give any account of the same for a period of several years after his majority, and his graduation as a doctor of medicine at Dartmouth College. Dr. Piper's microscopic work in this case covers a large field. His numerous tables of enlarged drawings or tracings present the characteristics, similarities, and differences of these writings plainly and in detail. With the aid of the *camera lucida* he has made drawings of the disputed signature, portions of the "Dear Wife" letters, and the defendant's letters, the Gumpel imitation of the plaintiff's signature, and his admitted signature to bank-checks; and of sundry words, letters, and terminals of each, so as to make apparent to ordinary observation any singularity of formation, feature, or proportion that may serve to distinguish or identify either of them. Assuming that his observations and delineations are correct, to the contrary of which nothing appears save the surmises and conjectures of counsel, he has accumulated a great mass of material facts, from which any person of ordinary intelligence and power of observation and deduction may draw a comparatively safe conclusion as to the question in dispute, so far, at least, as the same can be determined by an inspection of the writings themselves. A peculiarity in the formation of a letter or the manner of writing a word, that, under ordinary circumstances, would not be discerned or apprehended, when magnified several hundred times, becomes as noticeable as the features of the human face. Dr. Piper states that a person, in writing, usually makes his terminals and "t" crossings with less care or consciousness than any other part of the word; from which he deduces the conclusion, and a very plausible one, to say the least of it, that a person engaged in making a tracing of another's writing is apt to betray himself by lapsing into his own habit or style at these points. The tables of enlarged terminals and "t" crossings, taken from the admitted writings of the parties, show a very marked difference; those of the defendant being blunt or clubbed at the latter end, while those of the plaintiff are generally lighter, and invariably pointed or tapering at the termination. They also show that the terminals and "t" crossings in the "Dear Wife" letters are in this respect very like the defendant's and unlike the plaintiff's. On the whole, Dr. Piper's unqualified conclusion is that the signature to the declaration was not written by the plaintiff, and that it was written by the witness Gumpel; and that the "Dear Wife" letter in ink, and, at least, the word "wife" in the other two, known as "Exhibits 11 and 37," are tracings made by the defendant.

Besides Dr. Piper, the plaintiff called on this point Mr. H. C. Hyde, Mr. R. C. Hopkins, Mr. J. P. Martin, Mr. J. H. Dobinson, and Mr. F. W. Smith. The latter three are very familiar with the plaintiff's writing. Mr. Martin was in his employ as book-keeper, cashier, and otherwise, for 10 or 15 years. Mr. Dobinson has been his pri-

vate secretary since 1876, and Mr. Smith has been the paying teller of the Bank of California since 1879, during which time he has probably paid hundreds, if not thousands, of the plaintiff's checks. And from their knowledge of the plaintiff's writing they are decidedly of the opinion that the disputed signature is not his.

Hopkins has been the keeper of the Spanish archives in the United States surveyor general's office in this state for the past 30 years, and during that time has been much engaged in studying writings with a view to determining the question of their integrity, and making tracings of Spanish grants and documents. He says that he cannot state positively whether the signature to the declaration is the plaintiff's or not; but he is certain that it was written there before the body of the instrument was, and that the "Dear Wife" letter in ink is a tracing. Hyde is a well-known and experienced expert. He made the tracing on which Gumpel declined to give an opinion. On the trial of *Sharon* v. *Sharon* he said, without having made any special examination of it, that he thought the signature to the declaration genuine; but now, after a thorough examination of the subject, he says he is certain that it is not genuine; and that the "Dear Wife" letter in ink is a tracing with the word "wife" "built in;" and on this latter point his explanation of the matter is *clear* and convincing.

After an examination of the face of the instrument under the microscope, both Hyde and Piper are of the opinion that the signature to the declaration is written in different ink from the body of the instrument, and that the latter was written after the paper had been folded, as shown by the spreading and absorption of the ink where the pen crossed a fold; and this is plainly indicated by the enlarged drawings prepared by the latter. On the whole, the expert testimony, both in skill, character, and numbers, preponderates largely in favor of the plaintiff, and proves with as much certainty as such evidence well can that the signature to the declaration is false and forged, and that the "Dear Wife" letter in ink, and, at least, the word "wife" in the others, are tracings made by the defendant of letters written to her by the plaintiff with the word "wife" substituted for "Miss Hill" or "Allie." And this conclusion coincides with the impression made on my own mind by the examination of the writings.

The signature to the declaration is a good general imitation of the plaintiff's, and without special observation might easily pass for his. The signature of the plaintiff is generally well marked and uniform, but often varies in minor particulars. Perhaps none of the hundreds of them offered in evidence is more unlike the disputed one than the signature on the check of the same date with the declaration. The "a" in the check signature is closed at the top, while in the other it is open; and the lower limb of the "h" in the former leaves the stem at the line, while in the other it returns on the stem, or follows it upwards for some distance. But in other signa-

tures of the plaintiff these differences from the disputed signature do not appear; at least, not so plainly. But in the disputed signature the "S" in "Sharon" is nearly a third longer than the "h," but no such difference or peculiarity appears in any of the plaintiff's admitted signatures. On the contrary, the "h" in all of them that I have seen is fully as long, and sometimes longer, than the "S." Again, the up-strokes of the "W" in the plaintiff's signature, and particularly the second one, are uniformly heavier than the down-strokes, while in the disputed one the contrary is the case.

. And besides, and over and above all these particulars, there is a difference in the general effect and appearance of the signatures that is more readily felt than expressed. One may see at a glance that two pictures, which have a general similarity, are not portraits of the same person, when it might be difficult to give a satisfactory reason for the conclusion. The disputed signature is evidently the work of a skillful penman. The lines are comparatively smooth and steady, while the exact contrary is characteristic of the plaintiff's writing. Indeed, I very much doubt if he could write such a signature as the one to the declaration.

Who did write this disputed signature, it is not absolutely necessary to decide. So far as the evidence goes, it was not written by the plaintiff, and may have been written by the witness Gumpel. Dr. Piper, speaking as an expert, says he did write it. He denies it; but it may nevertheless have been done by him, not feloniously, but as an idle fancy or aimless experiment. For, whoever wrote it, I think there is nothing in this case more evident and certain than that this signature was not written after this declaration but before it, and therefore with no apparent wrongful intent. In the fall of 1883, and while Gumpel was understood to be in the employ of the plaintiff as an expert, he wrote, from memory, in Capt. Lee's office, the signature of the plaintiff, with the *addenda,* "Nevada, Aug. 25, 1880," which is much more like the signature to the declaration than any of the plaintiff's admitted signatures. And, so far as the genuineness of these disputed writings depends on the testimony of the parties, the preponderance of the evidence is with the plaintiff. In any view of the matter, the testimony of the plaintiff neutralizes that of the defendant. Whatever deductions may be made from his credibility, on account of his participation in this transaction and interest in the result, must also be made from hers, and even more; for, in the very nature of things, this is a game in which the woman has more at stake than the man. And, however unfavorably the plaintiff's general character for chastity may be affected by the evidence in this case, it must not be forgotten that, as the world goes and is, the sin of incontinence in a man is compatible with the virtue of veracity, while in the case of a woman, common opinion is otherwise. Nor is it intended by this suggestion to palliate the conduct of the plaintiff or excuse the want of chastity in the one sex

more than the other, but only, in estimating the relative value of the oath of these parties, to give the proper weight to the fact founded on common experience, that incontinence in a man does not usually imply the moral degradation and insensibility that it does in a woman.

And it must also be remembered that the plaintiff is a person of long standing and commanding position in this community, of large fortune and manifold business and social relations, and is therefore so far, and by all that these imply, specially bound to speak the truth, and responsible for the correctness of his statements; and all this, over and beyond the moral obligation arising from the divine injunction not to bear false witness, or the fear of the penalty attached by human law to the crime of perjury. On the other hand, the defendant is a comparatively obscure and unimportant person, without property or position in the world. Although apparently of respectable birth and lineage, she has deliberately separated herself from her people, and selected as her intimates and confidants doubtful persons from the lower walks of life; and, so far as appears, is only amenable to legal punishment for any false statement that she may make in this case, which all experience proves is not sufficiently certain to prevent perjury in legal proceedings. And by this nothing more is meant than that, while a poor and obscure person may be naturally and at heart as truthful as a rich and prominent one, and even more so, nevertheless, other things being equal, property and position are in themselves some certain guaranty of truth in their possessor, for the reason, if none other, that he is thereby rendered more liable and vulnerable to attack on account of any public moral delinquency, and has more to lose if found or thought guilty thereof than one wholly wanting in these particulars.

But this is not all. There is much in the testimony of the defendant in this case that must affect her credibility unfavorably. It is full of reckless, improbable, and in some instances undoubtedly false statements. Take this one, for illustration. The story that some time in 1880, and prior to the date of the alleged marriage, she gave the plaintiff $7,500 to invest in stocks for her, is undoubtedly false; and she has attempted to support it, not only by perjury, but by forgery. Perceiving that the payment to her, under the circumstances, of that large sum, shortly before she left the plaintiff's hotel, bore upon its face the evidence that it was given to a discarded mistress rather than a deserted wife, she deliberately swore, both in *Sharon* v. *Sharon* and in this case, that the transaction was a return to her of that amount which she had put into the plaintiff's hands some 18 months before for investment; and not only that, but she produced on the trial in the former case, to support her statement, a writing to that effect, purporting to be signed by the plaintiff and witnessed by Nellie Brackett. But when asked, on cross-examination, to produce that paper here, she declined to do so or to answer any question about it. And Nellie Brackett swears that the writing was manufactured

by the defendant; that she copied the signature of the plaintiff from one in an autograph album, and that she witnessed it at the defendant's request, upon an understanding that it was only to be used ·to influence her lawyers, and the defendant afterwards quarreled with her because she would not go on the stand and swear to it. And while it may not be safe to accept any statement on the uncorroborated testimony of this young woman, the innate improbability of the defendant's story, and her refusal to produce the paper, or answer concerning it, is ample corroboration. And in a suit brought by the defendant against the plaintiff in the superior court, in May, 1884, on the agreement given in part payment of this sum of $7,500 to recover the installments due thereon for October, November, and December, 1883, amounting to $750, it was found by said court, sitting without a jury, that said writing was given to the defendant on November 7, 1881, "in consideration of past illicit intercourse between them," and also in consideration of a written receipt and promise to the plaintiff by the defendant "to make no further demand upon him, and not further to annoy him in any manner." And while it is possible that, notwithstanding the falsehood of the defendant in this and other respects, the alleged declaration may be genuine, it must be conceded that neither that fact, nor any circumstance tending to prove the same, can be established by her uncorroborated oath.

Another circumstance strongly contradictory of the defendant's account of this transaction is the fact that nearly a year after the pretended advance, and before its alleged return, she deliberately obtained from the plaintiff a contract to hold 100 shares of Belcher for her, to be paid for on delivery. Now, if the plaintiff then owed the defendant $7,500, which, according to her account, had also been advanced to him for the very purpose of being invested in stocks, why hold these stocks for payment absolutely? Why not credit her on the contract with the amount due her from the seller, and agree to deliver on payment of the balance of $2,500? Or, what would be more natural still, why not deliver her stock at once for the amount due her? Nor is this transaction, viewed in any light, the kind of intercourse we might expect between a fond old millionaire and his darling young wife in the fourth moon of their marriage. It follows that on the testimony of the parties, as well as that of the experts, the decided weight of the evidence is against the genuineness of the declaration and letters.

And now let us see what the evidence is, on the face of these documents, as to their genuineness or falsity. Of the many circumstances that might be mentioned under this head, a few of the most striking must suffice. The declaration is written on note-paper instead of legal-cap, although written in an office well supplied with stationery for business purposes. It is written on the first half sheet instead of a whole one. It begins at the top line of the second page instead of the first one, and is finished back on the unruled space at the top of the latter. The signature of the plaintiff is on the top line

of the first page, where it might have been written as an autograph or imitation, or even without any purpose; and, considered as a signature to a legal instrument, has the unusual and unmeaning appendage, "Nevada, Aug. 25, 1880;" and this, although that date, and the fact that the alleged signer was of Nevada, was already stated three times in the body of the writing. It is full of verbose formalisms and useless repetitions, and in structure and verbiage is just what might be expected from a stylish, half-educated woman, and is altogether unlike what might be expected from the dictation of a person of experience, brevity, and directness, such as the plaintiff appears to be. The last four lines are written much closer than the others, and the words contained in them are crowded together, and two of them abbreviated; and even then there was barely room for the matter without trenching on the signature, after omitting certain words and parts thereof—19 in number—which were used in corresponding and foregoing parts of the instrument. Counsel for the plaintiff has called attention to these omissions in his brief, by inserting them in red ink. Substituting italics for the red ink, the omissions appear as follows: "The presence of Almighty God, take Sarah Althea Hill, of the city *and county* of San Francisco, *state of California*, to be my lawful and wedded wife, *and* do here acknowledge *and declare* myself to be the husband of Sarah Althea Hill, *of the city and county of San Francisco, state of California.*" Taking common experience and observation in such matters as a guide, the most satisfactory inference from the facts on the face of the declaration is that the body of it was written after and over the signature. I know it was said on the argument, and there is force in the suggestion, that if the instrument was premeditatedly written over a signature, either genuine or false, in a matter of so much moment as this, the writer would most likely have experimented with the subject until the matter was got into such form and number of words as would conveniently fill the space preceding the signature, without stretching, crowding, or omission. But the conclusion already stated, that the signature was written before the declaration, is by far the most reasonable inference from the evidence afforded by the document itself; and this cannot be overcome or made doubtful by mere plausible conjecture as to what a prudent and skillful person would or might have done under the circumstances; for this is not the first time in which persons engaged in an illegal or criminal transaction have strangely or foolishly, as it appears to others after the fact, omitted to take some very simple precaution to prevent detection or failure.

The "Dear Wife" letters have nothing wifely about them except the word "wife" in the address. The four in pencil are short, curt scrawls, announcing the sending of money, presumably on account of her monthly stipend of $500, with a jocular remark or familiar expression added, such as a guardian might write to his ward, or an attorney to his client. They are dated in different months, and ap-

parently relate to monthly payments. The one of April 1st says, "I send you the 'balance,' two hundred and fifty dollars;" and the one of May 5th says, "You have had at different times [mentioning them] two hundred and forty dollars; the 'balance' is two hundred and sixty dollars, which find inclosed." The "balance" of what? Why the "balance" of the $500 a month the plaintiff was paying her on some account. There is not a particle of love or affection in the letters; not even enough to suggest that she was his mistress. The ink letter is longer and more formal. It was written in reply to one from her soon after she took up her residence in the Grand, in which she had evidently complained that the plaintiff's manager, Mr. Thorn, had not treated her properly. So far as this complaint was well founded, it probably arose from the fact that the manager suspected she was more than a boarder and less than a wife. But there is nothing wifely in this letter either, except the word "wife" in the address. The writer hopes that the inclosed letter to Mr. Thorn will command the "kind courtesy," not respect, she deserves, and the letter to Thorn is to the same effect. There is not a particle of love or affection in it from one end to the other. It is such a letter as the plaintiff might have written to Miss Hill, but hardly to his young bride of less than two months' existence. And there are some particular circumstances connected with this ink letter which prove it to be a tracing beyond a doubt.

The plaintiff swears that he wrote the original of the ink letter at the same time that he wrote the inclosed one to Thorn, at the agency of the Bank of California, in Virginia, and on its paper. The one to Thorn, which passed through the hands of the defendant; shows on its face that it was so written. The two letters were practically one transaction with one person, and were inclosed in one envelope to the defendant. Under these circumstances the only reasonable conclusion is that they were both written on the same kind of paper. But it was a difficult and tedious task to trace the lithographic head on this paper, nor is it likely that it was obtainable here. So the tracing was made on plain paper, and on its face betrays its fraudulent origin, and furnishes another striking instance of the truth of the proverb, "murder will out." The photographic copies of the declaration and letters indicate that the originals are worn and soiled, and the witnesses who have seen them say that such is their appearance. But this appearance has been put upon them to give color to the assertion that they are originals of some years' existence, which have been carried about and seen hard usage, and particularly were not fresh tracings on new paper. Nellie Brackett swears that the soiling and crumpling process was a part of their manufacture; that the defendant wet them with coffee grounds, and ironed them, and held them over the gas, and the like, to give the new smooth paper the appearance of age and use. Ah Sam, the defendant's Chinese servant, at Laurel place, gives a very graphic account of the

process. He says he lived with her "two Christmases ago," and saw her with papers in the kitchen, which she put dirt and coffee on to make them look old and yellow, and that he ironed them for her.

The defendant's answer to this evidence is that she buried the documents for safety in a tin can in the cellar, where, strange to say, they got wet, but whether from the sprinkling of the street or a shower does not appear, and she afterwards ironed them to dry and smooth them. But this does not account for the corners of some of them, and particularly the upper ones of the ink letter, having the appearance of being burned off, as though they had got singed in the gas. And the story indicates that she then had a great deal more concern for the safety of her "papers" than when she left them in a loose roll on the wall behind a picture at Martha Wilson's; and, taken altogether, it is evidently a weak invention of the defendant's in support of what she knows to be false and forged writings. And thus one falsehood begets another from the beginning to the end of this case.

When compared with the usual and ordinary conduct of married men and women under like circumstances, there is such incongruity and want of harmony between the "Dear Wife" address of these letters, and the general tone and subject-matter of them, that they must be, as the plaintiff insists, and the evidence already considered is sufficient to show, at least in the one instance, the tracings of a genuine letter, with the word "wife" substituted for "Miss Hill" or "Allie," and in the others genuine letters in which a like substitution has been made.

But the defendant relies largely, in support of her case, on what may be called contemporaneous evidence of the existence of these documents, and her own declarations concerning the same, and her relation with the plaintiff, to third persons, in the nature of res gestæ. For instance, she testifies that she told her uncle, Mr. W. R. Sloan, while she was still at the Grand, that she was secretly married to the plaintiff, because he suspected something wrong, and threatened "to break every bone in Sharon's body;" and that she subsequently showed him the declaration and letters at Martha Wilson's house, soon after she left the Grand; that she did not tell her brother, or aunt, Mrs. W. J. Bryan, but did tell her grandmother, Mrs. W. J. Brawley, of the marriage, but at what time does not appear. She also testifies that she told Mary E. Pleasant of the marriage while at the Grand, and, soon after she left that place, showed her the declaration and letters; that she also showed the declaration to Martha Wilson, and read it to her on October 14, 1880, and that Vesta Snow was present, and read it at the same time, to whom she also showed the letters after she left the Grand; and that she showed both declaration and letters to Nellie Brackett early in 1882.

Nellie Brackett first met the defendant in the early part of 1882. She was then about 17 years of age, and the defendant made a sort of a confidant and dependent companion of her. In August, 1882,

the defendant went to live at Mrs. Brackett's, where she remained until the middle of November, when she moved elsewhere, taking Nellie with her, against the wishes of her parents, and keeping her so until near the close of the year 1883, when the quarrel took place on account of the latter's refusal to swear to the forged receipt, as already stated. On the trial of *Sharon* v. *Sharon* she was called as a witness by the defendant, and testified that she had seen the declaration and letters as early as March, 1882; but, on being recalled by the plaintiff, she said her former testimony was false in that respect; and she testifies in this case that she never saw the Sharon letters until June or July, 1883, and there was then no one of them addressed to the plaintiff as "wife," and she did not see the declaration until some time after that. The defendant testifies that in the summer of 1882 she renewed her friendly relations with the plaintiff, and visited him occasionally at his rooms at the Palace, and that at one of these visits she took Nellie with her, and secreted her at night behind the bureau in the plaintiff's room, so that she could see him and her go to bed together, and hear what they said and did while there, with a view of having her testify to the same, if need be,—particularly anything that indicated they were married,—as she was afraid the defendant might deny the declaration. Nellie Brackett now testifies that this story is wholly false; that the defendant concocted it in the fall of 1883, and had her learn it by heart, and go on the stand in *Sharon* v. *Sharon* and swear to it. For the honor of her sex, I trust she tells the truth about it now; for I would much quicker and rather believe that the defendant was wicked enough to commit perjury than that she or any other woman was vile enough to do such a dirty thing with this young girl.

Martha Wilson is a poor, nervous little negro woman, born a slave, who can neither read nor write. While the defendant was at the Grand she employed her occasionally as a seamstress, and had breakfasts from her restaurant. The defendant made much of her, and sought refuge in her house when she was expelled from the Grand, and was there off and on for some time. On the trial of *Sharon* v. *Sharon* she swore, when called by the defendant, that the declaration was shown and read to her by the defendant and Vesta Snow at her house on Mary street, on October 14, 1880, when the defendant called for her to go with her to the furniture factory to obtain some special articles for her rooms at the Grand on the written order of the plaintiff of that date; and the testimony of the defendant and Vesta Snow is to the same effect in this case. But Martha Wilson, being recalled by the plaintiff in *Sharon* v. *Sharon,* testified that she never saw or heard anything of the kind until late in the fall of 1883, when the defendant showed her the declaration, and induced her to swear to this falsehood out of sympathy and a promise of $5,000, and that she took Vesta Snow, who was in her employ at the time, to the defendant, where she was also shown the declaration, and induced to swear to

this story. On her cross-examination, when recalled in *Sharon* v. *Sharon*, she contradicted herself badly, and evidently was made to say what she did not intend, and what was not true. But here she tells a lucid, plain story, and explains that on that cross-examination she was so stormed and raved at by Mr. Tyler that she did not know what she was saying.

But it has been shown beyond a doubt that the key-note of this story, the meeting of the parties at Martha Wilson's house, on the date of the furniture order, is totally false. Vesta Snow says she went to Martha Wilson's house that day, October 14th, at the request of Martha's husband, to ask her to come to the restaurant then kept by her at 644 Mission street; and she remembers the one circumstance by the other, and that Martha Wilson had a restaurant at that place on that day, and so says the defendant. But the landlord and the mechanics, who furnished and fitted up the restaurant, swear, and produce their books of original entry to support their statements, that Martha Wilson did not occupy the place until some time in November, and probably as late as the 10th. And soon after the trial of *Sharon* v. *Sharon*, Martha Wilson was indicted in the state court for perjury in denying that she had seen or heard read the declaration as stated by the defendant. Upon this indictment she has since been tried, both the defendant and Vesta Snow being witnesses against her, and found not guilty.

Vesta Snow is a woman of doubtful repute, who has worked for Martha Wilson, and appears to be keeping a cheap lodging-house. She testifies in this case, as in *Sharon* v. *Sharon*, that she saw and read the declaration at Martha Wilson's house, on October 14, 1880; and also that soon after the defendant left the Grand she went one day to San Jose, and that while she was gone she (Vesta Snow) went to Martha Wilson's, and they took a bundle of the defendant's papers from behind a picture on the wall, and she looked over them, and read them "some," and the declaration, and sundry "Dear Wife" letters signed "Sharon," and a furniture order of October 14, 1880, were among them. Now, one item of this statement is undoubtedly false. The defendant obtained the furniture on the order of October 14, 1880, and delivered it to the person in charge, and did not have it in 1881. Mr. Cushman, her witness, swears that he was then in the plaintiff's employ at the factory, and received the order, which, by accident, was not placed among the factory papers, but kept by him, and that the defendant never saw it again until October 13, 1883. And the rest of the story is too absurd and unreasonable for any credence. For who can believe that the defendant, smarting under her recent expulsion from the Grand, would leave papers of so much importance to her as this declaration and these letters in a loose package behind a picture on the wall, at Martha Wilson's, for Vesta Snow and other busybodies to pry into and meddle with, while she was gone to San Jose? And yet the defendant

does not hesitate to back her witness, and swear she left the papers behind the picture, as Vesta Snow states, and adds that when she came back she met her uncle there, and took him into the dining-room and showed him the documents. So, then, this kind of contemporaneous evidence is reduced to Vesta Snow, who appears unworthy of credit, and Mary E. Pleasant, of whom more hereafter.

But why are not her relatives called, to whom she says she disclosed the fact of her marriage to the plaintiff, and particularly her uncle, to whom she says she made the disclosure while she was at the Grand, and to whom she says she showed the declaration at Martha Wilson's soon after she left there? What more probable than, if she could get the testimony of persons like these to verify her claim and corroborate her statements, she would not be leaning on such broken reeds as Snow and Pleasant? Counsel for the defendant, when pressed on this point during the argument, replied that it was not competent for the defendant to prove her own declarations in support of the writing or the marriage; but if the plaintiff wanted to contradict her in this respect, he could have called those persons for that purpose. But it was time enough to discuss the question of competency when the objection was made by the plaintiff. If the defendant really believed that she could prove these acts and declarations of hers by these relatives, she would have called them, of course. It may be admitted that the competency of the proof was in part open to argument; but that would not have prevented her from offering it, at least, especially as she did introduce testimony of the same kind. If the declarations as to the marriage or the existence of the declaration were made during her residence at the Grand, they were, in my judgment, admissible as a part of the *res gestæ*, (1 Whart. Ev. §§ 258, 259; 2 Greenl. Ev. § 462; 1 Bish. Mar. & Div. §§ 438, 540;) but certainly it was competent to call her uncle to prove that he had seen the declaration of marriage and "Dear Wife" letters at Martha Wilson's house just after the defendant left the Grand. These relatives are admitted on all hands to be respectable people, and it is a very suspicious circumstance that not one of them, not even the brother, is called or appears to support the defendant in any way. Her omission to call them to corroborate her statements is an admission that they would not do so because they could not. It is true that the plaintiff might have called them in rebuttal to contradict the defendant; but as she in effect admitted, by not calling them, that they would not corroborate her, that was sufficient for his purpose, and he might well refrain from needlessly bringing them into painful prominence in this unpleasant and unsavory affair.

Mary E. Pleasant, better known as Mammie Pleasant, is a conspicuous and important figure in this affair, without whom it would probably never have been brought before the public. She appears to be a shrewd old negress of considerable means, who has lived in San Francisco many years, and is engaged in furnishing and fitting

up houses and rooms, and caring for women and girls who need a mammie or a manager, as the case may be. The defendant states that she became acquainted with this witness early in 1881, and soon after told her of her marriage, and showed her the documents; that from the time she had the trouble with the plaintiff she put herself under her direction and control, and by her advice suppressed all allusion to herself as the wife of the plaintiff in the letters she wrote him after she had been ordered from the hotel; and, as an excuse for this extraordinary abnegation of herself and affairs in favor of this old woman, she swears:

"Mammie Pleasant was old, and had the experience, and she had the experience of lots of *girls and women,*—had the experience of the world; and being a servant, and being a wife, and being the head of families, I took her advice and wrote just about what she would dictate. * * * I was much of a baby."

Mammie Pleasant has taken charge of this case from the beginning, and, to use her own phrase, is making the defendant's "fight," whom she supports, and to whom she was forced to admit, after much evasion, she has advanced more than $5,000, and how much more she would not tell. In my judgment, this case, and the forgeries and perjuries committed in its support, have their origin largely in the brain of this scheming, trafficking, crafty old woman. She states that as early as 1881 the defendant wanted her to furnish her house at a cost of $5,000 or $6,000 on the strength of her relations with the plaintiff. But it seems that Mammie was not certain that the plaintiff could be held liable for the expense, and so she called on her counsel, Mr. Tyler, and stated the case to him, without, as she is careful to say, mentioning any names; but said that the man owned two hotels, and was living in one of them, and the woman in the other, which, under the circumstances, is equivalent to saying "the party of the other part" is William·Sharon. After due deliberation, Mr. Tyler gave her a written opinion, which she says cannot now be found, to the effect that such a contract as she mentioned and he suggested was a lawful marriage, under the Code, and the supposed man who owned two hotels (the Palace and the Grand) would be legally liable for the expense of furnishing his "Code" or "contract" wife with a suitable residence, although he was then maintaining her at a cost of $500 a month at the Grand. Mr. Tyler admits that in the fall of 1881, or the spring of 1882, he was consulted by the witness, as she states, and that he gave her a written opinion to the effect that the man would be liable; but I am quite certain that, if the real date of this conversation is ever satisfactorily ascertained, it will be seen that it took place in 1883. But however this may be, defendant and the witness being thus instructed or informed as to what constituted a valid contract or declaration of marriage under the Code, in due time, and by means best known to themselves, produced this document, which as a legal composition is worthy of its origin, and which, in the language of the

senior counsel for the defendant, is beneath the learning and skill of a "jack-legged lawyer."

On the other hand, a number of apparently respectable witnesses testify to declarations and conversations of the defendant during her residence at the Grand and afterwards that are utterly irreconcilable with the idea that when they were made she had any idea she was the wife of the plaintiff.

Mrs. Mary H. Brackett, the mother of Nellie, says the defendant lodged at her house from early in August to late in November of 1882, and that shortly before she left she told her that she had been engaged to the plaintiff, but it was broken off. Her brother, she said, was opposed to the match, because Sharon's "pedigree was inferior to hers." She also said he was a shriveled-up old man, anyhow, whom no one would marry but for his money.

Mrs. Sarah Millett, formerly Sarah Orr, was for a long time seamstress at the Grand. Her room was near the defendant's, and they appear to have been quite intimate. She swears that while the defendant was living at the hotel she told her the plaintiff was her beau, and that just before he left for Washington, in January, 1881, he wanted her to go with him and be married privately, which she declined to do, and was since sorry for it; and this she said many times, including the last night when she was in the hotel, when the witness was lying on the bed with her. In the spring of 1882 this witness called to see the defendant on Ellis street, when the latter begged her to bring herself and Sharon together again, promising, if he married her, to give the witness a house and lot.

Mrs. Sarah Morgan heard the defendant say at Mrs. Hardenberg's lunch table at Oakland, in August, 1881, that her engagement with Sharon was broken off, and that she was going east and may be to Europe; and that in 1880, and after August 25th, she told the witness that she was "engaged to be married to Senator Sharon."

Mrs. Harriet Kenyon was with the defendant as maid, except for one week, from September 11 to the latter part of November, 1881. The facts stated in her testimony are altogether incompatible with the idea that the defendant was, or even wanted to be, the plaintiff's wife, but rather that the old love for the lawyer was on again, whom she visited slyly, and dined with at the Verein club, and came home speaking of him as, "———, sweetie, how I love you!"

Mrs. Nellie Bacon knew the defendant slightly when she first lived at the Baldwin. In the fall of 1880 she went to the Grand to board, where she remained until April, 1881. She says that during this time she saw the defendant daily, and she said the plaintiff was paying her attention, and might propose to her; that a proposal from him involved "many delightful things, and one not so delightful,—his advanced age;" but that she preferred the lawyer to any of her lovers. In January, 1881, when the plaintiff went to Washington, the witness, at the request of the defendant, draughted a letter for her to the

plaintiff, designed to make him propose or compromise himself, which she copied and sent to him; but soon after the plaintiff returned from Washington she said she had trouble with him, and was afraid he would never marry her.

It is true that the defendant denies all these statements, and speaks contemptuously of the people who make them as persons beneath her notice. But they appear to have been her associates, even in her better days, and there is not a circumstance in the case that makes against the integrity and character of either of them. Besides, it won't do to sneer at these people while she consorts with Vesta Snow and Mammie Pleasant. Add to this, her credit is so badly damaged that her unsupported statement is not sufficient to overcome, or even seriously impair, the effect of positive testimony from unimpeached and, so far as appears, unimpeachable witnesses.

And, lastly, let us consider how the existence of these documents, and the claim of the defendant that she is the wife of the plaintiff since August 25, 1880, comport or correspond with the situation of the parties at the time, and their daily walk and conversation since. In August, 1880, the plaintiff was in the decline of life, in the possession of a very large fortune, with a family of grown-up children, to whom he was much attached. As was said in *Holmes* v. *Holmes*, 1 Sawy. 119, in speaking of a person somewhat similarly situated: "With him the primary object of marriage, the procreation of children, had been long accomplished; and the secondary one, the avoiding of fornication, does not appear to have much concerned him." The defendant was a mature young woman, of rather prepossessing appearance and tolerable attainments, with some years' experience in hotel life and stock speculations. During the past eight or ten years she had lived in comparative luxury and ease on money derived from her family. But early in 1880 she found herself without means, and the losing party in a protracted game of hearts, for which she sought, but without effect—

> "To give repentance to her lover,
> And wring his bosom"—

by committing suicide in his presence.

In this desperate condition she met the plaintiff, an unmarried man, with the reputation of a Giovanni, and, without any formal introduction, accepted an invitation to his private office to "talk stocks," which soon ended, as she must have expected, if not desired, in talking about herself. If this interview had ever taken place, as the defendant relates it, it was much more likely, under the circumstances, to have ended in an arrangement by which the plaintiff would pay her $500 a month to be his convenient friend, than that he should then and there make her his wife, and admit her to an unqualified marital right and interest in his immense fortune. Taking the defendant's account of the transaction, the pages of fiction furnish no parallel to

the singular and unnatural conduct of these parties. There was no preliminary courtship, but barely an acquaintance between them. They came together fortuitously in the stock operations of California street, and their personal intercouse began with a proposition from the one that the other should be his mistress, which she declined, apparently without being offended, when he, unable to control his sudden passion, offered her marriage, which she readily accepted. After a few words of parley as to the *modus operandi*, she agreed to a secret marriage, to be evidenced by a writing under the Code, executed by the parties, but unattested by witnesses. Thereupon the defendant, at the suggestion and dictation of the plaintiff, wrote at one sitting, *currente calamo*, this unique declaration, without altering or correcting a word or phrase therein, to which the latter then signed his name, adding, I suppose, by way of emphasis, the words, "Nevada, Aug. 25, 1880." And then, without more ado, without even a parting kiss or fond embrace, they went their several ways as if nothing more had happened than a deal in Belcher; not knowing, and apparently not caring, whether they should ever meet again. This ardent lover, whose fervent affection led him to back the offer of his plethoric purse with his widowed hand, turned his back on the lovely and consenting Althea to give his heart and soul to the study and control of Nevada mines and politics, while she, in the pathetic language of counsel, remained "an ungathered rose."

They separated without any arrangement for the future, and no communication passed between them for weeks thereafter; and none appears to have taken place until about the date of the letter to her at the Baldwin, which reads more like a solicitation for an assignation than a communication from a husband to a wife. During this time the Galindo Hotel burned down, and she was compelled to seek new lodgings, and went back to the Baldwin. She admits that she never informed her alleged husband of the occurrence or her whereabouts, and when asked to explain this singular conduct, she could do no better than give this frivolous and flippant answer, which carries its refutation on its face.

"I knew when he came down, [from Nevada,] if he wanted to see me, he could find me. I don't think it necessary for wives to run after their husbands. I didn't take the trouble to notify him where I had gone to. I thought, if he cared so much for me as he pretended to, he would find me. I am not in the habit of running after people."

The defendant's idea of what a wife would or should do, under such circumstances, is evidently not founded on experience, and, judging from her conduct and the explanation of the same, it is evident that she has yet to feel the tender solicitude that a true woman has for one to whom she has given her heart and hand in holy wedlock. And, now, could anything be more unnatural and improbable than this? There is no escape from the conclusion,—the conduct of the parties

was contrary to human nature and common experience, and makes the story of the marriage utterly incredible, even if it was not contradicted by the oath of the plaintiff.

But the conduct of the parties, after they found one another, also contradicts and is altogether irreconcilable with her claim of marriage, and stamps with the mark of falsehood and forgery the declaration and letters relied on to support it. It is apparent that the defendant went to the Grand to live in pursuance of some arrangement with the plaintiff soon after the letter to her of September 25, 1880. This is plainly indicated by the contents of the letter to her from Virginia, inclosing the one to Thorn, and of that also. But during her 15 months' residence there, the parties, so far as appears, never addressed or spoke of one another, in public or private, orally or in writing, as husband and wife, or said anything that implied such relation. Nor does it appear that any such claim was ever made or admitted by either of them, under any circumstances. The intercourse between the parties, so far as is known, or may be inferred from the evidence, was of a familiar and somewhat commonplace character, but utterly wanting in the tender consideration and respect usual and proper between husband and wife in their station of life.

The character of his letters to her has already been commented on. They are very brief, and either relate to the payment of her allowance, or contain an invitation to dinner, which plainly implies that she was not in the habit of sitting at his table or expected there, unless specially invited. They are utterly void of affection, and altogether lacking in mention or even allusion to the numberless and nameless little incidents and affairs peculiar to every married couple, and which, taken together, constitute the charm as well as the staple of married life; and, although Christmas and New Year passed, and a birthday came to her while there, it does not appear that she ever received a present, greeting, or other token of affection from the plaintiff.

But there are convincing proofs in the conduct of the parties, other than these general and negatives ones, against this claim of marriage. Take the circumstance of concealing herself in the plaintiff's rooms, and watching him and another undress and go to bed together, and the indifferent and indecent levity with which she carried the story to the seamstress. Waiving the moral insensibility which such conduct implies, it is inconceivable that a wife could witness such a scene without some manifestation of anguish, if not anger, and, what is worse, that she could regard it as a good joke, and gleefully relate it as such to others. Speaking of the affair, she says, "I laughed at it, and told it to a good many people. It was a very amusing affair to me." Afterwards, when she came to sign her deposition, and had had time to reflect, and perhaps receive a suggestion, she seems to have realized the damaging nature of her admission, and said that, although she laughed at the affair, she was "angry" too. But whether

she was "amused" or "angry," or whether she laughed simply or with a laughter akin to tears, she did not act like a wife.

Towards the close of the year 1881 the plaintiff had evidently gotten tired of the defendant, or distrusted her, and probably both. Moved by these considerations he had a settlement with her, in which he gave her $7,500, as already stated, for which she gave him a receipt in full of all demands, soon after which he had her summarily, and against her abject petition and remonstrance, expelled from the hotel. Now, if the plaintiff was married to this woman, and knew she had the written evidence in her possession of that fact, it is not reasonable or probable that he would have gone to such extremity with her; and, although it may be claimed that he acted on the supposition that she had lost the declaration, and she swears she told him so, for the purpose of preventing him from getting it away from her, he must have known that, if she had letters of his addressed to her as "Dear Wife," they were as good weapons in her hands as the declaration itself. However, it is sufficient to say that his conduct on this occasion was anything but that of a husband. In fact, he never, so far as appears, treated her otherwise than as a plaything or fancy for which he was paying as he went, and expected to as long as it suited him.

But the conduct of the defendant on this occasion is enough, in my judgment, to settle this question against her, even if the plaintiff was silent on the subject. When she was ordered to leave the hotel, she wrote the plaintiff three letters in quick succession, beseeching him by every consideration that occurred to her to allow her to remain on the old footing under his roof. If at the time she believed herself to be his wife, it is impossible that she should have written these abject appeals to the plaintiff, every word and syllable of which read like the wail of a poor discarded friend or mistress, and not the confident and certain reply of an outraged wife, conscious of her rights and her power to assert them. It is not necessary, and space will not permit, to call attention to these letters in detail. They are contemporaneous conduct of the defendant, at the most important crisis in her relations with the plaintiff, and their purport cannot be misunderstood. The mere perusal of them is enough to convince any one that they were not written by a wife to her husband. These honored terms do not even appear in them. In her direst distress she dare not address him as husband, or call herself his wife. The highest ground on which she bases her appeal for mercy is "friendship,"—an indefinite term which might well be used to characterize the relation between any unmarried man and woman. She asks the question, would you "stoop to injure a *girl*, and one whom you have pretended to love?" And again she says: "Don't do things now that will make *talk*." What "talk" is she afraid of but "talk" about their doubtful or illicit relations? Further on she urges her claim in language that cannot be misunderstood for that of a wife:

"Mr. Sharon, you have been kind to me. I have said I hoped my God would forsake me when I ceased to show my gratitude." "I had hoped to always have your friendship and good-will throughout life, and always have your good advice to guide me." "I valued your friendship more than all the world. Have I not given up everything and everybody for it?" "I have always been kind to you, and tried to do whatever I could to please you, and I hope at least, in your unjust anger, you will let us *apparently part friends,* and don't do or say anything that could create or make any *gossip.*"

"Gossip" about what? That the defendant was the plaintiff's wife, and they had been secretly married. Was that what she was afraid of? No, not at all; but rather that she was his leman, and had misbehaved herself and been discharged. The plaintiff took no notice of her wail, and she was compelled to go. But she was not without hope that they might be friends again, and in the summer of 1882 she appears to have been in the habit of calling on him at the Palace, but her calls were never returned; and in August of that year she wrote the plaintiff the remarkable letter known as the "Us Girls" or "Egg and Champagne" letter. It is given above in full, and speaks for itself. How any one can have the hardihood to claim that it was written by a wife—and a deeply injured one—to a cruel and unfaithful husband, is more than I can understand. It is apparently the work of an artful woman who is anxious to get her net over the head of a wayward old millionaire again, and recall him to her side once more,—not so much for love as moonlight drives, visits to the springs, lovely days in the country, egg in champagne, and the like; and, distrusting the power of her own familiar charms and honeyed phrases, she adroitly contrives to put young "Nell" in the foreground, as a fresh lure to the wary old bird.

Sometime after this the defendant took Nellie Brackett with her to the Palace, and the plaintiff had them both put out of the hotel; whereupon the letter signed Miss Brackett, and known as the "Old Sharon" letter, was written and sent to the plaintiff. The defendant says the letter was written by Nellie Brackett, but that she knew of it and approved it; but I think there is no doubt but that she dictated it, or wrote it herself, and had Nellie copy it. But that is not very material to my present purpose. Certainly the writer of this letter never dreamed that the defendant was the wife of the man she was berating; and if Nellie wrote it, it is another cogent circumstance to show that she did not know of the alleged marriage, or the existence of the disputed documents, and that the defendant's statement, that she had before then told her of the one and showed her the other, is untrue; and to this effect is Nellie Brackett's testimony. But if it was written or dictated by the defendant, it is only another link in the long chain of independent and indisputable circumstances contradictory of the defendant's claim and testimony. The writer speaks of the defendant as "a motherless, fatherless *girl,* * * * alone in the world," and leaves no room for even an implication that she ever thought of her as the wife of any one. The style and matter

indicate that the defendant can be fierce and abusive as well as wheedling and fond; but she had no thought then that the person she addressed as "you horrible, horrible man" was her own dear husband.

The character and contents of these five letters of the defendant are too damaging to her claim to be passed over in silence. They could not be directly denied, but a weak attempt has been made to palliate them. The defendant first took refuge in the secrecy clause of the declaration, which bound her not to make its contents "public" for two years, although it is probable that the last two of these letters were written after that period had expired. She said she was advised that if she did not keep that promise the marriage would become void, or the plaintiff would make her trouble, and therefore she did not feel at liberty to address him, even privately, as his wife or her husband, even when he was driving her from his presence and protection. It is not likely that any lawyer ever gave her any such absurd advice, and, as she has failed to call the adviser to corroborate her statement, that story may be dismissed. However, on being confronted with some imaginary conversations she says she had with the plaintiff during this period, in which she told him to his teeth that she was his wife and meant to have her rights as such, she fell back on her good genius, Mammie Pleasant. She says she wrote the letters and wanted to do so as the plaintiff's wife, but this wise old manager would not let her write a word to the plaintiff indicating that she was his wife, for fear it would "rile" him and make trouble. This is a very flimsy story, and altogether unworthy of credit. To one who has seen and heard the defendant in court, and has read the report of her examination before the examiner, the idea that old Mammie Pleasant, or any one else, could control her tongue or pen in her intercourse with the plaintiff is simply ridiculous. Neither is it reasonable that she, or any one else, would regard it as a violation of the secrecy clause in the declaration for her to address the plaintiff in private as his wife, and to insist on being treated accordingly. She did, according to her own statement, tell a number of persons before this of the marriage, and she says she did not think that was making it "public." Then, how could she imagine she was not at liberty to speak of the matter in private to "the party of the other part?"

But the inconsistency of her conduct, compared with her claim, does not stop here. For more than a year after the expiration of the secrecy clause she made no sign or pretense of being the plaintiff's wife. During this time the plaintiff paid her no attention, but treated her as a person he was well rid of. Her financial resources were daily diminishing as she neared the end of the provision made for her by the plaintiff in the fall of 1881. There was no longer any reason why she should not openly address the plaintiff as his wife, and demand recognition and support from him accordingly. Not only

this, but she had every reason now to exhibit her documents to her brother and other relatives, and at least claim their countenance and advice. But, instead of this, she gave herself and her cause into the keeping of an old woman, who appears to be no better than a go-between, and one William Neilson, of whom the counsel for the plaintiff said, on the argument, without objection or reply from any one, as a reason for not having taken his testimony: "It was not thought worth while to tarnish the record with any statement he might make." And through such agencies and advice as Pleasant's and Neilson's, she finally, on September 8, 1883, without a note of warning to or demand on her alleged husband, precipitated her case on the public in a melodramatic and roundabout way, by having the plaintiff arrested for adultery, on the assumption that he was her husband, and soon after publishing the declaration and what purported to be a "Dear Wife" letter. But the original of this letter has never been produced, and the defendant on her examination admitted that she never had one like it. Nellie Brackett swears that it was addressed, "My Dear ————," and that the defendant afterwards spoiled it in trying to substitute the word "Wife" for the dash. Her testimony on this point is substantially as follows:

"After Mr. Sharon's arrest, Neilson said he would publish the letter addressed 'My Dear ————' as 'My Dear Wife.' Miss Hill said she did not like that, because she had no such letter. Neilson said he would see that she had a 'Wife' letter out of that one that had a dash on it. After four or five weeks, he not attending to it, she tried to fix that letter herself and spoiled it."

Her testimony is strongly corroborated by that of the defendant, and squares with the admitted facts and probabilities of the case. But the effect of this circumstance does not stop here. The transaction furnishes another convincing argument against the existence of the "Dear Wife" letters as late as September, 1883; for if the defendant had had the "Dear Wife" letters when Neilson published the admitted spurious one, she would certainly have furnished him one of them for publication.

Neilson's relations with the defendant at that time, and his position in the affair, are not doubtful. He was her agent and adviser, and knew as well as she did that she then had no "Dear Wife" letters. This will appear from the agreement between her and her counsel for the division of the prospective fruits of this predatory litigation. On October 24, 1883, Mr. Tyler made a written agreement with the defendant, she signing it as "S. A. Hill," for the prosecution of a suit against the plaintiff for the vindication of her good name and a division of the common property, which they subsequently alleged to be of the value of $10,000,000, for one-half of what he might recover. The agreement contains a clause to the effect that Mr. Tyler will not settle with Sharon without the consent of the defendant "and her agent, William Neilson," who doubtless was an agent with an interest, and well advised in the premises. The only inference to be drawn

from these facts is that on September 8, 1883, and until some time afterwards, the "Dear Wife" letters were not in existence. The tracing and alteration had not then been done. The conspiracy had not progressed so far. No credible witness swears to having seen them earlier than September 26th; and if any one had, in the light of these facts, it would be considered a mistake. R. P. Clement says he saw them between September 26th and October 10th; C. D. Cushman says on October 20th; Samuel Soule says on November 23d; and W. B. Tyler says in October. Vesta Snow and Mammie Pleasant are the only persons who say they saw them earlier.

I have thus gone over the salient points in this case at some length. Much more might be said on minor points to the same effect. But this, in my judgment, is sufficient to show that, humanly speaking, it is not possible that this declaration of marriage was ever signed by the plaintiff, and that it is morally certain that both it and the "Dear Wife" letters are false; that they were practically forged by the defendant, by writing the declaration over a simulated signature, and by making tracings and alterations of letters from the plaintiff to herself, and substituting in the address thereof the word "Wife" for "Miss Hill" or "Allie," and omitting at the end of the one in ink the words "yours truly;" and that the claim of the defendant to be the wife of the plaintiff is wholly false, and has been put forth by her and her co-conspirators for no other purpose than to despoil the plaintiff of his property. In this undertaking, doubtless, the proverbial sympathy of the multitude for an attractive young woman, engaged in an affair of this kind with an immoral old millionaire, was largely relied on to make the conspiracy successful. But in a court of justice such considerations have no place. Here, at least, the conduct of the parties must be measured and characterized by the evidence, and have effect according to the law in such cases provided.

A woman who voluntarily submits to live with a millionaire for hire ought not, after she finds herself supplanted or discharged, to be allowed to punish her paramour for the immorality of which she was a part, and may be the cause, by compelling him to recognize her as his wife and endow her of his fortune. If society thinks it expedient to punish men and women for the sin of fornication, let it do so directly. But until so authorized, the courts have no right to assume such function, and, least of all, by aiding one of the parties to an irregular sexual intercourse, to despoil the other, on the improbable pretense that the same was matrimonial and not meretricious.

The question of whether there was a marriage between these parties, assuming the defendant's statement to be true, does not directly arise in this case. This suit is brought to annul the written evidence of the alleged marriage, on the ground of its falsity, and to enjoin the defendant from setting it up or using it to the prejudice or injury of

the plaintiff. But, in determining this question, the conduct of the parties during the time it was claimed they were living under this instrument as man and wife has necessarily been examined, and found not to support such claim. And, so far as the element of consent in this alleged marriage depends on this declaration, the conclusion that it is false is equivalent to a determination that there was no marriage between the parties, and that their intercourse was meretricious.

But I cannot refrain from saying, in conclusion, that a community which allows the origin and integrity of the family, the corner-stone of society, to rest on no surer or better foundation than a union of the sexes, evidenced only by a secret writing, and unaccompanied by any public recognition of each other as husband and wife, or the assumption of marital rights, duties, and obligations except furtive intercourse, more befitting a brothel than otherwise, ought to remove the cross from its banner and symbols, and replace it with the crescent.

The plaintiff is entitled to the relief prayed for; and it is so ordered.

SAWYER, J., (*concurring*.) The following statement of the proceedings in this case will present the points of law decided: The bill was filed October 3, 1883, the object being to cancel, as a forgery and a fraud, an alleged written declaration of marriage, a copy of which is set out in the bill. A subpœna was thereupon issued, and on October 3, 1883, duly served on the respondent, who entered an appearance on the next rule-day, November 3, 1883. On November 1, 1883, nearly a month after the filing of the bill and service of subpœna in the case, the respondent, by the name of Sarah Althea Sharon, filed a complaint against William Sharon, complainant herein, in the superior court of the city and county of San Francisco, wherein she alleged that on August 25, 1880, she and said Sharon, by mutual agreement, became husband and wife, and commenced cohabiting. together as such; that, "inasmuch as said marriage had not been solemnized in the mode provided by section 70 of the Civil Code of California, the plaintiff and defendant jointly made a declaration of marriage in writing, signed by each of them, substantially in form required by section 75 of the Civil Code of California, and until the month of November, 1881, the plaintiff and defendant lived and cohabitated together in said city and county as husband and wife;" that on or about November 5, 1881, defendant demanded of the plaintiff in said suit a surrender of said declaration of marriage, and threatened violence if she refused to comply with his demand,—"refused to recognize his said marriage with plaintiff, and drove plaintiff from him, and refused to live or cohabit with her for more than a year, thereby willfully deserting her." In addition to desertion, she alleged numerous acts of adultery with other women, as further grounds for divorce. She then prays "that her marriage with said defendant may be declared legal and valid;" "that she may be divorced from said defendant;"

and for a division of the common property, alleged to be of more than $10,000,000 in value. On November 10, 1883, defendant, William Sharon, filed his answer to said complaint in the superior court, denying all the allegations relating to the marriage, and averring that said alleged declaration of marriage in writing is a forgery and fraud. On November 22, 1883, defendant, Sharon, removed the case to this court, on the ground that he was a citizen of the state of Nevada, and plaintiff a citizen of California; and the transcript of the record was filed in this court two days thereafter, on November 24, 1883. On December 3, 1883, the plaintiff in said suit gave notice of a motion, based on the record in the case, to remand the same to the state court, on the ground "that the said circuit court has no jurisdiction in the suit, neither of the subject-matter thereof nor of the parties." Without bringing this motion to a hearing, on December 31, 1883, on application of plaintiff's attorneys therein, and on stipulation of counsel, as follows: "It is hereby stipulated by and between the respective parties that the above-entitled suit be remanded to the superior court of the city and county of San Francisco, state of California, whence it came,"—it was "ordered that the above-entitled cause be, and the same hereby is, remanded to the superior court of the city and county of San Francisco." After the case had been thus remanded to the superior court, on January 3, 1884, a stipulation in the following language, signed by the attorneys of the respective parties, was filed in said superior court:

"It is hereby stipulated and agreed, by and between the respective parties to this suit, that the above-entitled cause may be assigned to department 2 of said court, and tried by Hon. J. F. SULLIVAN, without a jury."

In the mean time, on the rule-day next succeeding her appearance in this court, December 3, 1883, respondent, Sarah Althea Hill, filed a demurrer to the bill in this suit, which was argued and submitted on January 21, 1884, and after due consideration overruled March 3, 1884, in an opinion reported in 10 Sawy. 48, and 20 Fed. Rep. 1.

On April 24, 1884, after two extensions by the court of time to plead, a plea *in abatement* was filed by respondent, alleging (1) another suit pending in the superior court for the same cause,—said suit of *Sharon* v. *Sharon;* (2) that complainant, Sharon, was, at the commencement of the suit, and still continued to be, a citizen of California, and not of Nevada, as alleged by him. A replication to this plea was filed May 5, 1884. The case then, in pursuance of the practice of the court, went regularly upon the calendar of the July term, 1884, for trial of the issue on the plea in abatement; and on the regular call of the calendar, in pursuance of the rules and practice of this court, on July 14th, the first day of the term, it was set down for hearing for September 2, 1884. On September 2d, upon being regularly called in its order, the hearing was continued to October 15, 1884. On October 15th, the case, upon being regularly reached and called in its order, was submitted for decision by the counsel for com-

plainant, in pursuance of rule 44 of this court, no counsel appearing for respondent. The case was submitted on the pleadings, without evidence, none having been taken, more than five months having elapsed since the case was at issue on the plea, and the time for taking testimony having long before expired, no extension of time for taking testimony having been granted, or applied for by either party. On October 16, 1884, the plea was found false, and overruled on that ground, there being no evidence to support it. See opinion of the court, reported in 10 Sawy. 394, and 22 Fed. Rep. 28.

Leave to answer *to the merits* within 30 days having been given, and the time having been from time to time extended, an answer was finally filed on December 30, 1884, in which the allegations of the bill, including the allegation of the citizenship of complainant, were denied; an attempt being thereby made, without leave of the court first obtained, to again raise, in the general answer, the issue of citizenship, before determined and adjudged on the plea in abatement. No application had been made or leave granted for a rehearing on the plea in abatement, or to reopen that issue, already passed into judgment, and the interlocutory decree adjudging the plea false and overruling it was still in full force. A replication to the general answer having been filed, and the case put at issue January 2, 1885, the parties, shortly thereafter, proceeded to take testimony. During the time these proceedings were going on, the trial of the said divorce suit of *Sharon* v. *Sharon* was commenced in the said superior court on March 10, 1884, and continued from time to time until September 17, 1884, when it was finally submitted to the court for decision.

On February 18, 1885, the court filed its findings of fact and conclusions of law, and ordered a decree in favor of complainant, granting a divorce, which decree was entered upon the findings on February 19, 1885. In the decree, after reciting that it is "found that plaintiff and defendant intermarried in August, 1880, and that the defendant deserted the plaintiff in December, 1881," "it is ordered, adjudged, and decreed that the plaintiff and defendant are husband and wife, and that the marriage now existing between the plaintiff and Sarah Althea Sharon be, and the same is hereby, dissolved, and that said parties are, and each of them is, freed from the obligations thereof."

The second finding of the court in said case is as follows:

"That on the twenty-fifth day of August, A. D. 1880, the plaintiff and defendant each signed a certain declaration of marriage, in the words and figures following, to-wit: [Here is set out the contract in the same language and form as set out in the bill in this suit, and in the opinion of my associate, and also as it appears in 10 Sawy. 48, and 20 Fed. Rep. 1;]—which was the only written declaration, contract, or agreement of marriage ever entered into between said parties, and, at the time of signing said declaration, plaintiff and defendant mutually agreed to take each other as, and henceforth to be to each other, husband and wife."

The third, fourth, eighth, and ninth findings are as follows:

"(3) That afterwards, and about the ——— day of September, 1880, the plaintiff and defendant commenced living and cohabiting together, in the way usual with married people, although their cohabitation was kept secret, and so continued for the space of more than one year, and down to the twenty-fifth day of November, 1881, and during all of said time plaintiff and defendant mutually assumed towards each other marital rights, duties, and obligations.    (4) That during the time plaintiff and defendant so lived together, defendant visited her relations with her, escorted her to places of amusement, and introduced her to respectable families and to members of his own family, and wrote to her several letters, while absent from her, in which he addressed her as 'My Dear Wife.'"    "(8) That it is not true, as stated in the answer of defendant, that plaintiff has either falsely or fraudulently assumed the name of Sarah Althea Sharon; but, on the contrary, that it is her real name.  Nor is it true that she or any one forged the document mentioned in the complaint and heretofore set forth; on the contrary, the said document is genuine, and was signed by the plaintiff and defendant at the time it purports to have been signed.    (9) That defendant never introduced plaintiff as his wife, nor spoke of her as such in the presence of other persons; that plaintiff never introduced defendant as her husband, nor spoke to nor of him to other persons in his presence as her husband; that the parties were never reputed among their mutual friends to be husband and wife, nor was there at any time any mutual open recognition of such relationship by the parties, nor any public assumption by the parties of the relation of husband and wife."

On February 26, 1885, the defendant, Sharon, took and perfected an appeal from said judgment of the superior court to the supreme court of the state, and gave a bond of such character as, under the statute, to operate as a *supersedeas* and a stay of all proceedings pending the appeal, and the case now stands pending on appeal and undetermined in the supreme court of the state. After the rendering of the said judgment in the state court in said case of *Sharon* v. *Sharon*, the respondent presented to this court a certified copy of the pleadings, findings, and judgment (or decree) therein, and asked leave to file a supplemental answer in this case, setting up such record as *res adjudicata*, and praying a stay of proceedings in this case "until the judgment in said case of *Sarah Althea Sharon* v. *William Sharon shall become final*;" thus recognizing the fact that said judgment had not yet "*become final*." The complainant, in response, presented a copy of the record, showing that a suspensive appeal had been taken, and was then pending. On March 4, 1885, leave was given to file the supplemental answer, and it was filed; but the court reserved the determination of the effect of the proceedings set up in the supplemental answer until the final hearing of the case, and denied the motion to stay proceedings until the judgment shall "become final" in the state court. It also appeared, upon the final hearing, that defendant, Sharon, moved for a new trial in said case of *Sharon* v. *Sharon* in the superior court, and that said motion for new trial is still pending and undetermined in said court.

On March 9, 1885, in resisting an application on the part of complainant to compel the respondent in this case to produce certain papers before the examiner to be used in evidence, the respondent

urged that the bill did not allege the citizenship of the parties in such form as, upon its face, shows jurisdiction in this court over the case, and for that reason the court had no authority to make the order. This objection, after argument and full consideration, was overruled, and the bill, on that point, sustained in an opinion reported in 10 Sawy. 635, and 23 Fed. Rep. 353.

In resisting a further order to show cause why certain papers should not be produced before the examiner for purposes of evidence in the case, on April 20, 1885, the respondent filed several affidavits tending to show that the complainant, Sharon, was not, at the commencement of the suit, or at any time afterwards, a citizen of Nevada; but was during all the time a citizen of California, and therefore that the court had no jurisdiction over the case, and consequently no jurisdiction to make the order sought. The court, in a decision reported in 10 Sawy. 666, rejected the affidavits, on the grounds that the question of citizenship had been conclusively and finally determined *for this case* on the plea in abatement,—the decision and interlocutory decree adjudging the plea false being still in full force,—and that there was no longer an open issue in the case on the question of citizenship; also, on the ground that the issue, if open for trial, would not be determined upon *ex parte* affidavits, but only as one of the issues in the case. Notwithstanding these rulings, the respondent put in testimony before the examiner, under and subject to the objection of the complainant that it is immaterial and irrelevant to any open issue in the case, and, at the hearing, insisted that the issue was still open, and that the testimony should be considered, and the issue again decided on the evidence as *then presented.* Respondent's counsel also insisted upon again arguing the question made and decided on the demurrer, that the bill does not state a case for equitable cognizance. The court, being fully satisfied with its former decisions on these points, overruled the application of respondent's counsel, and declined to hear further argument upon them.

Upon the foregoing state of facts the points of law to be considered arise. It is first insisted that the complainant is estopped from litigating the validity of the alleged marriage contract in this case in this court, by the stipulation mentioned, in pursuance of which another case—the said case of *Sharon* v. *Sharon*—was remanded to the state court. It is claimed that by that stipulation all the matters in controversy between these parties were agreed to be litigated in the state court alone; but nothing of the kind appears, expressly or inferentially, in the stipulation. It makes no reference to this case at all. That case was commenced in the state court, and removed to this court by the defendant therein under the act of congress of 1875, on the supposition that he had a right to try it in the courts of the United States. The plaintiff in the case denied that right on the face of the record, on the grounds that the subject-matter—it being a suit for divorce—was not within the jurisdiction of this court in any event, and

that it did not appear to be a case for jurisdiction on the ground of citizenship, even if this court could take jurisdiction, in any case, of a suit for divorce. On these grounds complainant moved to remand the case, as having been improperly removed, and, in view of the decision of the supreme court in *Barber* v. *Barber*, 21 How. 584, the respective counsel may have supposed that there was some ground to believe that the motion might be sustained on the ground of want of jurisdiction over a suit for divorce, had it been prosecuted to a decision. However this may have been, the respondent's counsel, either having doubts upon this jurisdictional point, or for some other reason satisfactory to themselves, concluded not to require the motion to be pushed to a decision, and to permit the motion to be granted. Thereupon they consented, in writing, that the case should be remanded to the court whence it came. This was simply a substitute for the hearing of the motion, and a decision upon it, which, if sustained, would still compel them to go back. They simply submitted to the motion, and the only effect was to return the case to the state court, and place it *in statu quo*. The stipulation had no reference to any other case than that in which it was made, and no other purpose than to return it to the court in which it had been originally brought. It related to that case, and that case alone. It was not intended to affect, and did not in any way affect, this case, which goes upon an entirely different theory, and seeks different relief. The fact that there may be some questions common to both, cannot enlarge the effect of the stipulation in question.

It is also claimed that complainant is estopped from litigating this case in this court by the stipulation of his attorneys, filed in the divorce case of *Sharon* v. *Sharon*, in the superior court, waiving a jury, and for the trial of the issues of that case in department 2 of the superior court before Hon. J. F. SULLIVAN, judge of that department. But this stipulation, like the other, is only a stipulation as to the course of procedure in that case, having relation to that case, and to no other. Defendant was obliged to have his case tried in some one of the 12 departments of the superior court, and he was liable to have it assigned to any one of those departments for trial. Both parties being satisfied to try it in department 2, they designated that department by stipulation. This was but a substitute for the assignment of the case for trial in the usual mode. It had no other effect than to determine which one of the 12 departments to which it was liable to be assigned should try that particular case, then pending, and ready for trial in the superior court. The effect of the judgment of the court in the case tried in department 2 by reason of this stipulation, as matter of estoppel, is no greater and no less, and in no respect other, than if the case had been regularly assigned to that department for trial by the authority of the superior court, without the stipulation, and against the protest of defendant. This stipulation in no degree affects the action of the court as matter of estoppel.

Neither this stipulation, nor the stipulation to remand to the state court, taken separately,—nor do they in combination,—estop the complainant from proceeding in this case, nor can they in any respect affect this case.

The effect of the proceedings and judgment in the superior court is precisely what it would have been had that case never been removed to this court, and had it been tried in department 2, or any other department to which it had been properly assigned for trial, without the consent or any action of the defendant therein. And there was no possible plausible ground, deducible from the terms of the stipulations, for counsel to suppose that the stipulations affected, or that they could in any way affect, any other case than the one in which they were made. Nor did they, in fact, so suppose; for steps were being continuously taken by them, and the counsel of complainant in this case, without objection, while the proceedings were going on at the same time in the case in the state court. The two cases proceeded *pari passu* in the two courts.

As to the point upon which we declined to hear further argument, that the bill presents no case for equitable jurisdiction, and that, upon the facts stated, this is but a suit for jactitation of marriage, it is only necessary to observe that, upon the hearing on the demurrer, in which these points were argued, Judge SABIN, of the Nevada district, and myself, gave them the fullest and most careful consideration, and upon such consideration we were satisfied that the case is one proper for equitable cognizance. Our views will be found expressed in *Sharon* v. *Hill,* 10 Sawy. 48; S. C. 20 Fed. Rep. 1. We are now entirely satisfied with the ruling then made, and adhere to it.

We also, at the hearing, declined to hear the evidence offered by respondent, under objection of complainant as to its relevancy, to show that Sharon was, at the commencement of the suit and subsequently thereto, a citizen of California and not a citizen of Nevada, on the issue attempted to be raised, without leave of the court, in the general answer in bar on the merits, by denying the allegation of citizenship in the bill. We declined to consider the testimony, on the ground that there was no open issue in the case on that point, the same issue having been made, tried, and finally determined, for this case, on the plea in abatement. We also declined to hear further argument on the question as to whether the issue was still open for consideration, for the reason that it had been before fully argued in the case and decided, and we were satisfied with the decision. *Sharon* v. *Hill,* 10 Sawy. 666. We are still entirely satisfied that the issue as to citizenship was conclusively determined, for the case, on the plea in abatement, and was not open for further consideration on the general issue tendered in the answer in bar. Had the question not been raised and determined on a plea in abatement, it may be that, under the act of 1875, respondent might be entitled to raise the issue in the general answer in bar, and have it determined, with

the other issues, at the final hearing of the case. But on that point it is unnecessary now to express an opinion.

Where an issue of fact has been presented and determined upon a plea in abatement, and judgment rendered thereon, until set aside, and the issue has been reopened in some regular course of procedure, such determination of the issue is as conclusive and binding in all subsequent stages of the case as if tried and found at the final hearing, and the issue closed by a final judgment thereon. Conceding that the court had authority to reopen the issue, and allow testimony to be taken, after the time allowed by the equity rules prescribed by the supreme court had expired, there was still but one proper way to proceed, and that was to apply for a rehearing, upon a proper showing, excusing negligence, if any there was, or to set aside the interlocutory decree upon the plea in abatement, and reopen the plea, with leave to take testimony and retry that issue. Even then the reopening of the issue, granting leave to take testimony, and a retrial of the issue, would be a matter for the exercise of a sound discretion by the court, and not a matter of right. No such application, or any application to set aside that interlocutory decree and reopen that issue, has ever been made in the case. Such applications should be promptly made or they should not be granted. Seventy-five days, including extensions granted by the court against the wishes of complainant, elapsed before the general answer to the merits in bar was filed. During all that time, not only was no such application nor any application made to set aside the decision and interlocutory decree entered therein, and reopen that issue, but none has, at any time since, to this day, been made, and the interlocutory decree adjudging the plea false, and overruling it on that ground, now is in full force, unaffected by any order made, or even by any application for an order vacating it, or reopening the issue. On an application, had any been made, the complainant would have been entitled to be heard. It is not an *ex parte* proceeding. *Giant P. Co.* v. *California V. P. Co.*, 6 Sawy. 529; S. C. 5 Fed. Rep. 197.

The respondent not only did not apply for a rehearing on the plea in abatement, but, in the face of the ruling, and of the interlocutory decree adjudging it to be false, and in defiance of it, without leave of the court, denied in her answer the allegations of the bill as to citizenship, and thereby sought, in that form, without leave of the court, to retry the issue. The questions having been tried and adjudged on the plea in abatement, and that judgment remaining in full force, the complainant was not required, or expected, to put in evidence upon this point under the general issue. He was entitled to rely on the determination already made, until the issue should be again reopened in some proper form; and especially is this so, since the question of the finality of the decree for this case had been determined in an early stage of the proceedings, when raised upon affidavits. It cannot be presumed that complainant tried the case on the question of citizen-

ship in the same manner, or upon the same testimony, as he would have done had the issue been reopened in some proper form. Not only is the view expressed upon this point correct upon principle, but it is the settled doctrine of the supreme court. In *Grand Chute* v. *Winegar*, 15 Wall. 371, the eighth plea embraced the same matters which had been already set up and passed upon in a plea of abatement, and the court said in regard to it: "*A party having his plea in abatement passed upon by a jury, and found against him, is not permitted to set up the same matter in bar, and again go to the jury upon it.*" And it certainly cannot make any difference whether it is passed upon by a jury or by the court, where no new trial or rehearing has been granted. In the former decision we said: If the question "can be raised again in the general answer, on the merits, there would be no use of a plea in abatement. Such a plea, upon that practice, would only obstruct and prolong the proceedings, and increase the expenses of litigation, without any possible advantage to be gained thereby. The parties are entitled to an opportunity to have an issue once tried and determined. If, through negligence or otherwise, they do not present their evidence, or all of their evidence, the fault is their own, and they must abide the consequences." 10 Sawy. 669.

The provision of section 5 of the act of congress of 1875, relied on by respondent, that "if it shall appear to the satisfaction of said circuit court, at any time after such suit has been brought," that it does not involve a controversy properly within its jurisdiction, it shall be dismissed, doubtless means when it shall appear in some proper mode or form recognized by the rules of law and regularly established practice of the court. It does not mean that the point may be suggested at any time, or in any mode, outside the regular course of the established practice of the court, and tried over and over again, whenever and however the party chooses to suggest it. Such a loose mode of proceedings would be intolerable. It often happens that the defect regularly appears in the record; as where there is a want of proper allegations in the bill, but it has not before attracted the attention of the court; or where it appears in evidence, upon the issues properly open for decision. Whenever this is the case, or whenever the defect is made to appear to the court, in any stage of the proceedings, in its established course of procedure, the court will dismiss the case. This was always the rule on questions of jurisdiction, and the statute but gives express sanction to it, and requires its enforcement by the court of its own motion, whether counsel suggest it or not, without, however, attempting or professing to change the regularly established forms of procedure by means of which the issues shall be developed and tried, and by means of which the defect shall be made to appear. It is as important now to the due, convenient, economical, and speedy administration of justice that questions of jurisdiction, where they do not appear upon the face of the bill, should be determined upon pleas in abatement before going at large

into the merits of complicated cases, requiring long, tedious, and expensive trials, as it ever was. Any other practice would not only be extremely inconvenient, but often intolerably oppressive. We are fully satisfied with the former ruling on the point, and adhere to it. That the issue on the plea in abatement was properly determined in the case there can be no doubt, under the decisions of the supreme court. It is settled by that tribunal that the burden of proof on the plea was on the defendant. *De Sobry* v. *Nicholson*, 3 Wall. 423; *Sheppard* v. *Graves*, 14 How. 505; *Same* v. *Same*, Id. 512, 513. And there being no testimony to support the plea, it was properly adjudged false, and overruled.

Whether a party has the right, under the fourteenth amendment, to elect to retain his citizenship of the state of his birth or adoption, after he has taken up his residence temporarily or permanently in another state, is a question which, under the views adopted, we are not now called upon to determine. But see on this point the observations of the court in *Sharon* v. *Hill*, 10 Sawy. 673, and the cases in support of the affirmative of the proposition there cited from the decisions of the United States supreme court. If one has a right to retain his former citizenship after so becoming a resident of another state, then, even upon the imperfect evidence offered by the respondent, and disregarded by us at the hearing, there can be no doubt that Sharon was, in fact, a citizen of Nevada at the institution of the suit, and that he so continued.

The only remaining question of law to be decided is as to the effect of the findings and judgment of the superior court set up in the supplemental answer. At the time leave was given to file the supplemental answer the court was of the opinion that the matter set up as *res adjudicata* constituted no defense to the bill; but as it could not be known what view the supreme court might take, it was thought that respondent, in case of an adverse decree, would be entitled to have the matter in the record in such form as to be available in the supreme court on appeal, in case this court should be found to be in error upon the point. The application for leave to file a supplemental answer was therefore granted, and the point left open for further consideration on the final hearing. The court denied the motion for a stay of proceedings till the judgment in the state court should become final, for the reason that to do so, and thus give effect to the state judgment, as *res adjudicata*, would, in effect, be to arbitrarily turn the complainant over to the state court for his remedy in a matter wherein the constitution and laws of the United States gave him an absolute, unqualified right to seek his remedy in this court. To have stayed proceedings as asked, would have been equivalent, in its results, to dismissing complainant's bill, and leaving him only such remedy as the state courts afford.

Do the findings and judgment entered therein, set up in the supplemental answer now pending in the supreme court of the state upon

a suspensive appeal, constitute a final determination of the rights of the parties in such sense as to make them *res adjudicata* and available, as such, in this suit as matter of estoppel? We are fully satisfied that they do not. The effect of a judgment, final as to the subject-matter litigated and adjudged, is prescribed in sections 1908 and 1911 of the Code of Civil Procedure of the state of California, and is the same as had been established by the decisions of the courts before it was carried into the Code. To constitute *res adjudicata*, in the sense and with the effect indicated, the judgment should be *final*, not only as to the court in which it is rendered, but also final as to the subject-matter, and not subject to be set aside on motion for new trial, or on appeal. Judgments are said to be final in two senses: final as to the court in which they are rendered, so as to be subject to appeal; and final *as to the subject-matter upon which the judgment is rendered, so as not to be open for further consideration or modification in the tribunal wherein it is rendered, or in any other.* This distinction is clearly recognized in the law in this state and elsewhere. In *Hills* v. *Sherwood*, 33 Cal. 478, the court upon this point says:

"A judgment may be a final adjudication in different senses. It may be final as to the court which rendered it, *without being final* as to the subject-matter. 'The last decree of an inferior court is final in relation to the power of *that court, but not in relation to the property itself,* unless it be acquiesced in.' *U. S.* v. *The Peggy,* 1 Cranch, 103. Although a judgment may be final with reference to the court which pronounced it, and as such be the subject of an appeal, yet it is not final with reference to the *property or rights affected,* so long as it is subject to appeal and liable to be reversed."

Under the Code "a judgment is the *final determination of the rights of the parties* in an action or proceeding," (Code Civil Proc. § 577;) that is to say, final as to the subject-matter. The Code recognizes the distinction as to judgments final as to the subject-matter and final as to the courts rendering them. Thus, section 936 of the Code of Civil Procedure provides that "a judgment or order in a civil action, *except when expressly made final by this Code,* may be reviewed as prescribed in this title, and not otherwise." "*When expressly made final* by this Code" means, of course, final as to the subject-matter, —final and conclusive of the rights of the parties involved. But section 939 provides that "an appeal may be taken (1) from a final judgment in an action," etc.; "(2) from an order granting or refusing a new trial." See, also, section 963. In these sections it is equally obvious that the word "final" means "final" in the other sense,—"final" only as to the action of the court rendering it. It will be seen that independent appeals are given in the same case,—an appeal from the final judgment in the case, and an appeal from an order granting or refusing a new trial therein; and the several appeals are, in practice, frequently taken at different times, the appeal from the judgment being often first taken, and in such cases generally before the motion for a new trial has been acted upon in the court below.

Section 946 provides that "whenever an appeal is perfected, as provided in the preceding section of this chapter, it stays all further proceedings in the court below upon matters embraced therein, and releases from levy property which has been levied upon under execution issued upon such judgment." And section 1049 expressly provides that "an action is deemed *to be pending from the time of its commencement until its final determination upon appeal, or until the time for appeal has passed,* unless the judgment is sooner satisfied." By the express terms of this section, therefore, a judgment is not final as to the subject-matter,—is not a final or conclusive determination of the rights of the parties, not only "until the final determination on appeal," but where no appeal has been taken,—"until the time ·for appeal has passed." Until the time indicated the action is deemed to be pending; that is to say, remains inconclusive, not finally determined, and liable to be changed or altogether vacated and annulled. The action is therefore still pending, and the subject-matter remains *sub judice.* In *Newhall* v. *Sanger,* 92 U. S. 761, the supreme court held that the lands within the exterior limits of a fraudulent Mexican grant, containing four or five times the amount purported to be granted, were *sub judice,* and not liable to any other disposition until the final judgment of the supreme court, on appeal, rejecting the grant. The judgment in the state court set up is still pending upon appeal, perfected, as provided by the statute, in such mode as to stay all further proceeding on it, except to prosecute the appeal and a motion for a new trial. By the express terms of the statute the action is still "pending" and undetermined. The litigation of the matter in question is not ended in the state court. · It is still flagrant. The subject-matter is still *sub judice,* and a matter still *sub judice* cannot possibly be *res adjudicata* in any proper sense of that phrase. To say that a matter *sub judice* is at the same time *res adjudicata* would be a contradiction of terms. The two conditions with reference to the same subject-matter cannot possibly co-exist. Consider the consequences that might follow from the opposing view. Should this bill be dismissed on the plea of *res adjudicata* relied on, and the decree be affirmed on appeal, the judgment in the state court set up might afterwards be reversed, and the case remanded for new trial, or a new trial be granted in the superior court, when the defendant in this case would doubtless endeavor to set up the decree of this court as *res adjudicata* in the case in the state court, and seek a favorable judgment on that ground. Should she succeed, there would be two final and conclusive decrees based upon *res adjudicata,* where there would have been no final adjudication at all on the merits.

A doctrine that may lead to results so absurd cannot be reasonable, or the true one. But the effect of a judgment of a state court, suspended by an appeal, under the laws of California, is settled by the supreme court of the state in numerous cases, even before the adoption of the provisions of the Code herein cited and now in force.

Thus, in *Knowles* v. *Inches*, 12 Cal. 215, the court says: "This judgment, *suspended by appeal, cannot be considered as conclusive evidence of the fact of title,* even without reference to the manner in which it was obtained." So, in *Woodbury* v. *Bowman*, 13 Cal. 635, the court says: "The evidence offered on this point seems to have been the judgment roll in the suit of *Mokelumne Hill Co.* v. *Woodbury,* which cause was then pending in this court upon an appeal," etc. "We think it was properly rejected; an appeal having suspended the operation of the judgment for all purposes, it was not evidence on the question at issue, even between the parties to it." So, also, since the adoption of the Code, in *Murray* v. *Green*, 64 Cal. 369, the court says: "While the appeal from the judgment in *Porter* v. *Woodward* was pending, the operation of that judgment for all purposes was suspended, and *it was not admissible in evidence in any controversy between the parties.* Freem. Judgm. 328; *Woodbury* v. *Bowman*, 13 Cal. 634." *Thornton* v. *Mahoney*, 24 Cal. 569, and *McGarrahan* v. *Maxwell*, 28 Cal. 91, are to the same effect. See, also, *Glenn* v. *Brush*, 3 Colo. 26, and the numerous cases there cited.

Thus the effect of an appeal upon a judgment of the state courts of California, as *res adjudicata,* is settled by the decisions of the supreme court, independently of the present provisions of the Code on the subject. But there can be no possible doubt, it seems to us, under the provisions of the present Code cited, that a case upon appeal is still pending—still *sub judice*—until finally decided, and that it cannot be regarded as *res adjudicata,* or as having any effect as evidence. The effect or value of a judgment in the state court is therefore fixed by the Code and the decisions of the supreme court of the state of California. The effect or value of a judgment of a state court in this court can be no greater than in the state court, as determined by the laws of the state. *Mills* v. *Duryee*, 7 Cranch, 481; *Hampton* v. *McConnel*, 3 Wheat. 234. This being so, it will be unprofitable to examine the few cases cited from other states, arising under a different practice, and presenting different conditions, to support the opposing view.

It also appears by the evidence, and it has been repeatedly stated by respondent's counsel during the argument of this case, that a motion for a new trial has been made by defendant, Sharon, in the case of *Sharon* v. *Sharon,* set up in the supplemental answer, which said motion is still pending and undetermined in the said superior court. The judgment in that case, therefore, is also still subject to be set aside in the court of original jurisdiction, and subject to many contingencies before it can possibly be conclusive on the rights of the parties. A new trial may be granted, even in the superior court, on the ground of the insufficiency of the evidence to support the findings, upon newly-discovered evidence, and on many other grounds, and the granting of a new trial would put an end to the judgment. If denied in the court of original jurisdiction, there may be, as we have seen,

a separate and independent appeal, from the order denying a new trial, to the supreme court, and such order may be reversed, and a new trial ordered, on any of the grounds suggested, and thus the judgment be vacated. On a motion for new trial, and on appeal from an order denying it, the sufficiency of the evidence may be reviewed, and a new trial granted for want of sufficient evidence to justify the verdict or findings.

The supreme court of California has also recently determined the effect of a motion for a new trial upon the finality of a judgment, under the practice in California, in *Gillmore* v. *American Cent. Ins. Co.*, 65 Cal. 65, 66, the last volume published; S. C. 2 Pac. Rep. 882. The court says:

"Although no appeal had been taken from the judgment within statutory time, proceedings were pending upon a motion made by the defendant in the case to vacate the judgment and grant a new trial. That motion subjected the judgment to be reversed and made it liable to be set aside. The judgment was therefore not final, in the sense of the stipulation as to the right of the parties affected by it, and could not become so until the motion for new trial had been disposed of. *Hill* v. *Sherwood*, 33 Cal. 474. While proceeding are pending for the review of a judgment, either on appeal or motion for a new trial, the litigation on the merits of the case between the parties is not ended; there is no finality to the judgment in the sense of a final determination of the rights of the parties, though it may have become final for the purposes of an appeal from it."

To hold that a judgment subject to so many contingencies—liable to be set aside in so many ways—is *res adjudicata;* to have finally and conclusively determined the rights of the parties, in such sense that they are no longer open to question in any other proceeding or tribunal—would be but little short of absurd. It might as well be held that the mere bringing of an action would conclude the rights of a party to litigate the same subject-matter in any other jurisdiction. Assuming, therefore, but without deciding the point, the subject-matter of the suit and judgment relied on to be identical with that in this suit, in such sense as would render a judgment final as to the subject-matter, *res adjudicata*, yet in the present condition of the judgment it is still *sub judice* and not *res adjudicata;* and the finding and judgment in no degree estop the complainant from litigating the matter in this case. The defense of *res adjudicata* is overruled.

But if the judgment were final as to the rights of the parties, I am by no means satisfied that the complainant would be estopped by it *in this suit.* There are many strong reasons why he should not be. But it is unnecessary to determine that question now. I only refer to it because my associate has indicated his views upon the point, and I am not now prepared to concur in the views expressed. I therefore reserve my opinion upon the question until it properly arises for judicial determination, and until we can have an opportunity for its full discussion, and mature consideration.

I shall now call attention very generally to some of the salient

points developed in the testimony, and state my conclusions on the material issues of fact, but leave the full discussion of the evidence to my associate.

The great issue of fact in the case is whether the complainant signed the alleged written declaration of marriage set out in the bill. As to this issue but two parties testify who profess to know—others probably do know—whether he did or not, and these parties are the complainant and respondent themselves,—the apparent parties to the contract. The complainant, in the most positive and unequivocal language, denies that he executed the instrument, or that he ever saw it, or heard of it, or heard of any claim of wifehood by respondent under it, or otherwise, till about the time of his arrest for adultery, on the complaint of one Neilson, acting in concert with respondent, on September 8, 1883,—more than three years after its date, and more than a year after the stipulated time for secrecy had expired; and that he never, in his life, saw the instrument until he obtained an inspection of it in November following, under the order of one of the state courts. He also testifies that, according to the best of his judgment, the signature to the contract was not written by him. He is as "positive on the point as human judgment can dictate." On the other hand, the respondent as positively and unequivocally testifies that complainant did execute the contract; that she wrote it at his dictation, in his presence, and that they both signed it in the presence of each other. They both testify as to matters in regard to which they, respectively, have actual knowledge, and upon which they cannot possibly be innocently mistaken, and matters which could not well have been forgotten or misrecollected. One or the other, therefore, must have knowingly testified to a falsehood. There is no reasonable ground for escaping this conclusion. This being the case, the duty is devolved on the court of determining, so far as it is possible to do so, from all the evidence, and the intrinsic probabilities arising out of the known or undisputed facts, and facts satisfactorily proved, which party has testified to the truth and which to the falsehood.

The complainant is a well-known business man, of more than 30 years' standing, as generally and thoroughly known here as any man in the United States. There is nothing to throw a doubt upon his character for truth and veracity, except as it arises out of the testimony in this case directly or inferentially contradicting his own. Of the respondent we know much less,—indeed, little beyond her own account of herself; but as to her, also, there is nothing to impeach her character for truth and veracity beyond the testimony in the case contradictory of the testimony given by herself; the character of her testimony; the unusual and unsatisfactory tone and manner in which it was given; and such intrinsic probabilities and improbabilities as arise out of her testimony and the other testimony introduced. Conceding, then, for the purposes of the case, that the parties, at the out-

set, stand upon an equal footing as to character for truth and veracity, their naked statements are equally balanced, and we must determine from the other evidence, and the probabilities arising out of it, on which side is the preponderance.

Under the circumstances, the inquiry naturally suggests itself to the mind: To what extent are these parties contradicted or corroborated upon material matters by the direct testimony of other credible witnesses, testifying with regard to the same material facts? Upon examination of the testimony, I do not find that the complainant, Sharon, has been directly contradicted by other witnesses having positive knowledge of the facts as to any fact material to the case to which he has positively testified; unless upon some points he may be regarded as inferentially contradicted by Mrs. Pleasant, who is as deeply implicated in the conspiracy, if conspiracy there be, as the respondent herself, and, in view of the circumstances disclosed, whose testimony must be taken with a considerable degree of caution. On the other hand, the respondent has been directly contradicted, on many material points, as to her acts performed and declarations made from 1880 to 1883, wholly inconsistent with the idea that at those times she considered herself to be the wife of complainant. Such contradictions in many important matters, which I shall not take time to enumerate, are found in the testimony of Mrs. Bacon, Mrs. Morgan, Mrs. Kenyon, Mrs. Millett, and Mrs. Mary Brackett, and as to an important matter, in some aspects of the case,—the time of the opening of Martha Wilson's restaurant,—by several gentlemen of unimpeachable character, supported by contemporaneous entries in their account-books. Respondent, it is true, now sneers at all these female witnesses, and indulges in very uncomplimentary remarks concerning them; but they were at one time manifestly, from her own testimony, more or less intimate with her, and to a considerable extent enjoyed her confidence and society, and to that extent, by her past conduct and acts before the litigation was entered upon, they have her own indorsement. There is nothing else other than her contradictions, and their association and connection with this case, disclosed in the evidence, to discredit, generally, their testimony. The fact of so many witnesses among her former associates—*ante litem motam*—testifying directly contrary to respondent upon material matters, about which they cannot well be mistaken, tends strongly to impeach her credibility, and is worthy of serious consideration in deciding the great point in issue, thus otherwise left so equally balanced by the testimony of the two parties themselves. Besides, the whole tone and manner of testifying by respondent, and the inherent character of the testimony given by her, is extremely unsatisfactory. The tendency is not by any means to inspire confidence.

The complainant admits that he has known respondent from August, 1880, and respondent says that she first met complainant in the spring of 1880, but she cannot fix the date; and, between that time

and August 25th, that she had several interviews with him, but cannot tell how many, one of which was at the Baldwin Hotel, shortly before she went to the Galindo Hotel, at Oakland. The interviews, other than at the Baldwin, were either on the street, near the Bank of California, or at complainant's office, over the Bank of California. She cannot tell whether the interviews were once a month or oftener. As near as it can be made out from her testimony, she did not go to the Galindo until some two or three weeks or more after the incident of taking laudanum at the office of a prominent attorney, which was on May 10, 1880; and she does not know whether any one of the interviews with complainant took place before the happening of that incident. I think, therefore, it may be assumed that the acquaintance commenced, and all the interviews occurred, after May 10th, and consequently that there were but very few of them between that date and August 25th. As I understand her testimony, she does not positively identify more than two visits to complainant's office, which were had at his suggestion. At one of them she says that he proposed to give her $1,000 a month and the use of a horse, if she would consent to be his mistress. She so understood the proposition, and declined it, saying he had mistaken her character, and that he could obtain other women to serve in that capacity for a much smaller sum. She says that he then proposed marriage, which she accepted, and came to meet him again, by appointment, on August 25th; that she arrived a little late, and found complainant somewhat excited and nervous on that account, as he was going to Virginia City, Nevada, on that afternoon; that he had a table with paper, pens, and ink on it, and directed her to sit down and write as he dictated, which she did, and then wrote, at his dictation, the instrument in question, signing where he directed; that he had a small book in his hand at the time, which he consulted, and seemed to dictate from it, and a number of large books that looked like ordinary law books, from which he read passages showing that such marriages were lawful, and cases in which they had been sustained, and in which the wife had obtained property as such; that they stopped and talked, discussing matters from time to time as they proceeded; that it was all written at one sitting, and no part rewritten; that they were engaged in it, it might be an hour, an hour and a half, or perhaps two hours; that when it was finished complainant came round beside her, asked her if she was satisfied with it, and signed it, adding the words, "Nevada, Aug. 25, 1880;" that she was surprised at that mode of marriage, and so expressed herself, and said, "That can't be our marriage certificate, senator;" that complainant said that it was all right, and, as he was going away that afternoon, directed her to take it home and copy it all over nicely, and, when he returned, he would sign the new copy for her, and the rough one then signed he would keep for himself; that she then left with the document, and returned to the Galindo Hotel, at Oakland, and she supposes he went to Virginia. At

all events, she never saw anything more of him till some time after September 9th. This is her account of the courtship and marriage, which is positively denied by complainant. There is no evidence of any kind that she ever made a neat copy for them to execute on complainant's return, as she was directed to do, or that any copy was ever executed for complainant, or that the matter of making the neat copy was ever afterwards alluded to between them. The books alluded to were doubtless intended to be the pocket edition of the California Civil Code and some volumes of reports. But Mr. Dobinson, the private secretary of complainant, and who for years occupied. Sharon's rooms in that capacity, and who was perfectly familiar with all furniture and fittings up, testifies that no such books as described were kept in the office; that he would have seen them had they been there; and that he did not see any such there at that or any other time. They could hardly have been in the office without his knowledge, and this affords a strong presumption that no such books were there, and, to that extent, is in conflict with the respondent's testimony on this point, and supports the testimony of complainant.

I think it must be admitted that there is a strong intrinsic improbability that such an extraordinary contract, upon so short, casual, and exceptional an acquaintance, without consultation with or knowledge of her brother and numerous other relatives and friends, should be clandestinely entered into in such an extraordinary manner, by an honorable and virtuous young lady of 27, so intelligent and shrewd, and so well acquainted with the world, as the respondent has demonstrated herself to be. And it is no less intrinsically improbable that a man of complainant's experience, wealth, and position should enter into so strange a contract, with an honest purpose of honorable marriage, while there was no better reason for departing from the ordinary course of matrimonial alliances than has yet been suggested; and it seems, also, still more improbable that a man of complainant's knowledge of the world and shrewdness would, at his age, place himself in so embarrassing a position,—put his wealth and position at such hazard,—from the basest of motives, and with a deliberate purpose, so infamous and shocking to the moral sense, of deceiving respondent and accomplishing her ruin. A motive and purpose so infamous ought not to be attributed to a man hitherto holding a respectable position in society—such a position as would lead an intelligent lady of good connections and social position, knowing his standing, to marry him—against his solemn oath to the contrary, except upon testimony reasonably satisfactory to the mind; certainly not upon the unsupported testimony of an unusually intelligent and experienced party, capable of entering into a secret arrangement so extraordinary, upon so slight an acquaintance of exceptional character, without consulting with or the knowledge of her numerous relations and friends, including a brother, who had theretofore been to her all that a brother could be to a sister, and

who were readily accessible, and in habits of daily intercourse with her,—that brother, at the time, living in the same house with her, and serving as her protector. Again, according to respondent's own account, this interview and transaction having taken place somewhere from noon and afterwards, on August 25th, at its conclusion the parties separated, she going to her residence at the Galindo Hotel, in Oakland, and complainant, as she supposes, to Virginia City, Nevada, leaving by the 3:30 P. M. overland train, the only means at that time of travel between San Francisco and Virginia.

Respondent remained at the Galindo Hotel until it was destroyed by fire, on or about September 9th, when she returned to the Baldwin Hotel, in San Francisco, and remained till the latter part of September. The complainant remained in Virginia until some time after the destruction of the Galindo Hotel, in September, and returned to San Francisco between the date of that event and September 25th, the date not now being definitely fixed. He called on respondent, she says, at the Baldwin, before September 25th, but she cannot say how long before. It was probably but a short time before September 25th, for on that day complainant was active and urgent for an interview, he having on that day written her several notes, some of them in evidence,—I think four in all,—seeking an interview, addressed at the heading, "*My Dear Miss Hill.*" And immediately after that she removed to the Grand Hotel without even consulting with her brother, *who was with her at the Baldwin,* or informing him of her contemplated movement. Upon learning of the change, however, he immediately followed her to the Grand, and for her protection took up his residence at that house, thereby manifesting the deep interest he felt in her welfare. During the whole month, from the date of the alleged marriage contract, August 25th, to September 25th, there was no communication by word, letter, or telegraph between complainant and respondent, except the single call by complainant at the Baldwin at some time after his return from Virginia City, and before September 25th, the date of which is not fixed. Respondent did not even inform complainant of the burning of her residence, and her consequent removal. She did not intimate to her newly-acquired husband where she could be found on his return from Virginia City, and he was compelled to send his Chinese servant to Oakland and elsewhere to learn of her whereabouts; so that it is probable that the meeting at the Baldwin was not very long prior to September 25th, when complainant became so active and urgent for an interview. Thus a month or nearly so intervened between the entering into this extraordinary marriage contract and any further communication, or effort to communicate, between them. It does not appear that prior to complainant's return from Virginia City there had been any consummation of the marriage by marital intercourse.

The respondent, according to her own account, did not take sufficient interest in her newly-acquired husband to communicate with him, or

to inform him of her misfortune in being burned out, and compelled to remove, and where he could find her on his return; and gave as a reason for her neglect that she did not conceive it necessary for wives to run after their husbands, and that she supposed he would find her, if he wanted to, on his return from Virginia City. There was a daily mail, and at all times telegraphic communication, between San 'Francisco and Oakland and Virgina City, and yet nothing passed between these newly-married parties during nearly or quite the whole month usually designated as the "honey-moon," and under circumstances wherein we should certainly expect some written or other communication. These first *private* notes of the complainant after the alleged marriage were addressed, in the heading, "My Dear *Miss Hill*," and only intimated the desire for an interview for her benefit, saying: "Something I want to tell you about of interest to yourself." There is nothing in the notes breathing the spirit of a husband newly married, or even of half a century's standing. To my mind the conduct attributed to both parties by the respondent, during the month following the alleged marriage, is intrinsically improbable, had there been a marriage contract as claimed. I cannot reconcile such a course of conduct with my observation and experience of the course of human action, and the influence and operations of human affections. It seems incredible. It is, of course, possible that two parties can be so constituted that they could make such a contract, and conduct themselves under the circumstances and in the manner indicated during the month following marriage; but it is highly improbable, not to say utterly incredible, even when considered by itself, unaffected by other collateral facts; and such improbability is to be considered, and it should receive its due weight in connection with the other facts developed in the case.

We now come to the period from September 25, 1880, to November, 1881, while respondent resided at the Grand Hotel, and while the relations of the parties were most intimate, harmonious, and cordial; and afterwards, from the time of respondent's expulsion from the hotel, in December, 1881, until September 8, 1883, when complainant was arrested on a charge of adultery upon the complaint of Neilson, and at the instigation of respondent, *by means of which publicity was first given* to respondent's claim of wifehood. My associate has fully discussed the evidence and facts relating to this period, and I shall not go into particulars, but only state some facts appearing in the evidence, with a view of drawing the proper inference therefrom.

One distinguishing fact is that the alleged marriage was kept secret, not only during the two years provided for in the contract, but for a year or more afterwards, as it was never made public until the time of complainant's arrest, September 8, 1883. Secrecy is always a badge of suspicion and fraud, and especially so in matters of interest to society, and which public policy and the laws of well-regulated society require to have general publicity. Withholding knowledge of the

relations of the parties from the public, and especially from those who have a right to be informed upon the point, and clandestine sexual intercourse, are strongly indicative of meretricious, and not marital, relations. And to this effect are all the authorities upon the subject. The marriage and intercourse, in this instance, were kept profoundly secret from the public, and, so far as possible, from respondent's brother and other near relatives; and, so far as we know, only revealed, if at all, to a few who, to say the least, in view of the known facts, are of questionable standing, and who occupy an unenviable relation to the case,—parties to whom such a revelation was not likely to be made in a case where a contract in good faith required secrecy, and where it was studiously concealed from those having a right to know, and who would be quite as likely to keep a secret, if desirable to do it. Those relatives could, certainly, have had no motive to defeat the election of complainant to the senate after he had become so nearly allied to them by marriage. There has been introduced in evidence a number of letters and brief notes from complainant, addressed to respondent while she lived at the Grand Hotel, from September, 1880, to November, 1881, and during the year when the relations between the parties were the most intimate and cordial,—while respondent claims that they were happily, though secretly, cohabiting together as husband and wife. Of all these letters thus introduced, and if any were omitted it must be presumed that respondent would have offered all those favorable to her case, five appear to be addressed "My Dear Wife." These are positively declared by complainant to be forged and spurious, at least so far as the word "wife" is concerned. But, waiving a discussion of that point in this opinion, it having been covered by my associate, not one of these letters, aside from the word "wife," contains a word that suggests the relation of marriage, or breathes the spirit a husband would be expected to manifest in a correspondence, however cursory, casual, or unimportant, with his wife. That word is singularly inconsistent with the tone and matter of the rest of these letters.

No satisfactorily authenticated word or act on the part of complainant, indicating the relation of husband and wife, or inconsistent with meretricious relations, during the whole three years from August 25, 1880, to September 8, 1883, appears in the evidence, or supported by any direct evidence, other than that of the respondent herself. On the contrary, the letters all breathe a different spirit,—sometimes jocose, sometimes all business, and all, except the so-called "Dear Wife" letters, are addressed "My Dear Miss Hill," "My Dear Allie," or "My Dear A." The letters of earliest date—those written in the ardor of the waning honey-moon—only rise to the pitch of "My Dear Miss Hill." But these letters are fully discussed by my associate. I only refer to them for the purpose of drawing an inference. There does not appear to be any good reason why on one day complainant should address his wife "My Dear Miss Hill," and on another day,

"My Dear Wife;" or why, in their secret correspondence, intended for no other eyes, a husband should not always recognize his wife as wife. If he could trust her with *some such letters, and with the keeping of the marriage contract, why not with more?* But during all this period these parties were dealing with each other in money matters, even in small amounts, *at arms-length.* As early as December 5, 1880, but little over two months after going to the Grand, there was a stock transaction, wherein respondent drew a memorandum, which complainant signed, acknowledging that he held 100 shares of Belcher for "*Miss Hill, at $200 per share, to be paid for on delivery of the stock.*"[1] This was a private transaction between them, unknown to anybody, and *requiring no mask.* Why this particularity and care in carrying on and concealing under false names a business transaction between husband and wife? So, also, several of the notes from complainant to respondent, introduced in evidence, relate to moneys and accounts between the parties, which were nicely calculated and balanced to a cent, on the apparent basis of $500 per month, the amount which respondent testifies her husband was paying her. This was not merely pin-money, but funds out of which the wife of a man alleged by respondent to be worth many millions of dollars, with an income of from $30,000 to $100,000 per month, was to pay all her expenses, hotel bills, clothing, everything, and out of which she says she also purchased many articles of apparel for her husband, and the account regularly balanced and settled, as though they were dealings between utter strangers.

Yet respondent was offered, according to her own testimony, double the amount to take the position of mistress, she being regarded as twice as valuable in that capacity as in the capacity of wife. So, on November 7, 1881, the complainant paid the respondent $7,500 in cash, and notes payable to the order of "*Miss Hill,*" the balance of which has been recovered by respondent against complainant in a state court since the commencement of this suit. This the respondent claims to have been paid in settlement of a prior money demand. Complainant denied it, and he accounted for it in that suit on an entirely different theory. But these facts show the course of dealings in money matters between these parties at the very time when their marriage relations, if any such existed, were most harmonious and affectionate; while there *was no occasion between them for masking;* where no one else had occasion to know anything about the transactions; and even, though private, they were dealings, ostensibly, if not in fact, between these parties in the names and character

---

[1] In the transcript of the short-hand notes of testimony reported by the master the price appears $200, there being no point between the 2 and the ciphers. This must be an inadvertent omission, for it is a matter of public history and notoriety that, at that date, the value of Belcher stock was, in fact, only about two dollars per share, as a reference to the official records of the San Francisco Stock and Exchange Board, and the daily published reports of sales, will show. But I take the price as I find it in the record.                                                                              S.

of William Sharon and S. A. Hill, and not in the names of Mr. and Mrs. Sharon, in the character of husband and wife. They were, ostensibly, dealings at "arms-length," in money matters, sometimes of small amounts, between strangers. This is certainly not the ordinary course of transactions between husband and wife, brought up and educated in this country, imbued with American ideas; and, in view of our laws in relation to marriage, the legal *status* of marital property rights and marital and domestic polity, we naturally look for some recognition of the relation of wifehood from the husband in private transactions, correspondence, and intercourse—domestic, money, and otherwise—between husband and wife, other than the very few instances of the use of the word "wife" in the address of casual letters. We find none on the part of complainant in the relations between him and respondent, so far as they are disclosed to view,—not one instance.

Turning from the conduct of the complainant to that of the respondent during all the time from August 25, 1880, till about a year after the time for secrecy under the clause in the contract had expired, *we find it equally barren of any well-authenticated act or word of respondent, public or private, in complainant's presence, or in addressing him by letter, indicating that she during that period, at any time, regarded herself as the wife of complainant.* No witness ever heard her address complainant as husband, or any language indicating the existence of that relationship. We have a number of her letters addressed to complainant during that time,—private letters, intended for no eye but his,—and he alone was interested in keeping the secret, and could certainly be trusted with an endearing, wife-like letter,— be trusted with the keeping of his own secret,—but none containing the word "husband," or its equivalent, or any reference to matters between husband and wife, which either would desire, for that reason, not to have brought to the knowledge of others. All of these letters are addressed "My Dear Mr. Sharon," "My Dear Senator," or "My Dear Sen.,"—not one "My Dear Husband." And there is not a line or word in any of them that indicates any idea upon respondent's part that she was the wife of the party to whom they were addressed. There are appeals of the most passionate and pathetic character to his sense of justice, to his generosity, to his manhood, but not one in the character of wife,—not one addressed to him in the character of husband. But my associate has fully discussed these letters, and I need not dwell upon them further than to draw the natural inference, and to say that they are, in my judgment, wholly inconsistent with the idea that, at the time they were written, she thought or supposed she was the wife of complainant. It is inconceivable to me that a woman of the spirit and temper everywhere displayed by respondent, conscious of honor and wifehood, under the circumstances giving birth to some of these letters, could have written them to her husband without reminding him, at least, of the sacred tie binding them together.

Surely, to a man susceptible to the influences sought to be brought to bear upon him, an appeal to his honor, generosity, and manhood would not be less effective coming from a wife, in the character of a wife, than from a mistress, in her character of mistress. This failure to appeal to complainant as husband, to address him as husband, and to claim the rights of a wife, in these *private* letters, written under the distressing circumstances under which respondent found herself, is inexplicable upon any theory that she at that time supposed she was his wife. The claim that she acted under the advice of the aged colored woman, Mrs. Pleasant, is incredible and unsatisfactory. All her womanly instincts, and her resolute and dominating spirit, in which she is by no means deficient, would have rebelled against such a submissive and pusillanimous course.

Again, she states that on one occasion she concealed herself behind a bureau in her husband's bedroom, and remained there while he and another women occupied the bed *together,* and that she was greatly amused at what she witnessed. Is it credible that a high-spirited and passionate women, as respondent claims to be, and as she has on various occasions shown herself in fact to be, conscious that she was a scorned and grossly injured wife, could quietly witness such an exasperating act on the part of her husband, and tamely submit, and that the incident would greatly amuse her? So, on another occasion, according to her own testimony, she concealed a young girl of 18 behind the same bureau, in order that she might hear her husband call her wife while she and her husband went to bed together. What need of taking such means to satisfy Mrs. Pleasant, or anybody else, of her being the wife of complainant, if she at that time had the evidence of the fact in a genuine written contract, supported by the so-called "Dear Wife" letters, then in her control? Are these the acts of a person conscious of being the wife of the party under such espionage? But what was said on that occasion, in those moments of dalliance, is not in evidence, and we do not know that she, even then, drew from complainant's lips the coveted appellation, "wife," under circumstances where the most endearing terms were likely to be used.

So far as is shown by the evidence, therefore, there is no act or declaration, written or spoken, in the respondent's treatment of complainant during these three years, indicating that she supposed herself to be his wife, or that is not more consistent with the idea that those relations were meretricious rather than marital. The fact that she used complainant's carriage, as she says she did, is cited as evidence of treating her as a wife. But if there be any force in this, it is broken by the further fact, stated by herself, that complainant's mistresses have ever since been accustomed to freely use the same carriage, and be driven by the same coachman, in the same manner. Complainant's admitted mistresses, therefore, seem to have been treated alike, and put upon the same footing, in this particular, with

respondent herself. But I need not dwell on points so fully discussed by my associate. Is it too much to say that the whole course of conduct towards respondent, and on the part of respondent towards complainant, during those three eventful years, is in the highest degree improbable, had they been husband and wife? Is it possible that a husband and wife, cohabiting harmoniously, could so conduct themselves towards each other, and that during the first year of their married life?

There is strong evidence on the face of the alleged contract itself that it was written over the name of complainant after the signature had been written, and that parts of it, at least, were written after the paper was folded, and the signature before folding, showing that the signature must have been first written. Without enumerating the points, or discussing again the particulars pointed out by my associate leading to that conclusion, there is enough in the appearance to render it, in a very high degree, probable, when considered by *itself* alone, without reference to the testimony bearing upon other points, that such is the fact. So, also, upon comparing the signature with hundreds of signatures of complainant written from 1875 to 1883, conceded to be genuine, and the testimony of experts *pro* and *con*, it appears to be a better signature than any other of complainant's in evidence. It is smoother, more flowing, regular, artistic, and less cramped than the others admitted to be complainant's. There is not another in all the genuine signatures in evidence that contains all the distinguishing characteristics of the disputed signature. So the fact appears to me to be, after a careful comparison of the disputed signature with all others in evidence, in the light of expert testimony, and even without such light, some of the signatures having been enlarged by the microscope and photographic process, in order to show the prevailing characteristics more distinctly.

Several paying tellers in banks, including the Bank of California, who had paid hundreds and probably thousands of complainant's checks, and others long in his employ, and having the best opportunity to become familiar with his signature, except his former employe, Cushman; also a number of the most skillful experts,—testify that the disputed signature in this case is not the genuine signature of complainant, Sharon. There are others besides Cushman, of no special standing as experts, having less reason to be acquainted with complainant's handwriting, and Gumpel, who is a competent expert, who testify that they believe it to be genuine. To my eye, although I do not profess to be an expert, after a long and thorough examination and careful comparison of the numerous signatures in evidence claimed to most nearly resemble the one disputed,—there are over 3,000 in evidence,—in the light of all the expert testimony, it does not appear to be the genuine signature of complainant. There is one remarkable fact that attracts attention: There are several examples of signatures written by the expert Gumpel, at different times, at the

request of different parties, professedly in imitation of complainant's signature, and written from memory, without any signature before him. The signatures thus written, as they were written, and copies of them enlarged under the microscope and by photographic process, are in evidence; and to my eye, after a careful, studious comparison, there is not one of them written by Gumpel that is not more like the disputed signature than any one of all the numerous admittedly genuine signatures of complainant. Every one of those written by Gumpel contains all of the several peculiar and striking characteristics of the disputed signature, while not one of the genuine signatures of Sharon does. Some of Sharon's signatures contain one, and some another, of the peculiar characteristics of the disputed one; but no one contains all, or nearly all, of those characteristics, as Gumpel's do. This striking resemblance between the imitations of Gumpel and the disputed signature may result from the fact, if it be a fact,—but whether it be a fact or not we do not know,—that Gumpel took the disputed signature, assuming it to be genuine, as his exemplar, and practiced his imitations from that. If this was done, it would intelligently account for the similarity. In that case, however, it shows conclusively that Gumpel at the time fully appreciated all the peculiar characteristics of the disputed signature, and incorporated them into his imitations. That the peculiarities are found, both in the imitations by Gumpel and in the disputed signature, it seems to me, when pointed out, if not before, must be clearly apparent to any tolerably correct and appreciative eye.

The document, it is conceded, was written by respondent, and is alleged by her to have been written at one sitting, no part having been written over, and with interruptions at various points by conversation,—discussing the points as they rose during the writing,— the time occupied being about an hour and a half, or perhaps two hours. It was manifestly written with elaborate care in its mechanical execution. It is by far the best and most artistic specimen of respondent's penmanship exhibited in evidence. Not a word had to be erased, added to, corrected, or rewritten, except, in many instances, to shade more heavily, and apparently with different ink. I think the experience of every one familiar with such work will suggest that it is highly improbable that one could dictate from a book, and another, not accustomed to writing from dictation, sit down and write, so extraordinary a document of such length, while carrying on a conversation discussing the points, legal and otherwise, arising as they went along, without a single mistake requiring correction; especially so, when the last four lines are condensed into a smaller space by omitting several words found in the other corresponding parts of the contract, requiring, to some extent, a reconstruction of the sentences, and also by contracting others, as by using the character "&" for the word "and," in order, apparently, to accommodate the matter to be inserted to the available space; and neither the party

dictating nor the party writing would be likely to know in advance how much it was necessary to contract and condense. If this contract was written in the manner and under the circumstances stated, I think it must be conceded that it is a feat of accurate work that must attract attention,—a very extraordinary performance.

The ink of the signature appears to be different from the ink in which the contract is written, while there seem to be two kinds of ink in the contract, making three in all. According to Dobinson's testimony, but one kind of ink was in the office, other than copying-ink and red ink; and, according to Piper, the ink was not of the kind used in the office; and the inference arises that it is highly improbable that the instrument could have been written in complainant's office, or in the manner as stated by respondent. Taking the document itself, as it appears upon its face, comparing the signature with the numerous genuine signatures of complainant in evidence, in the light of the expert testimony, and of the testimony of respondent, as to the circumstances and mode of its preparation and execution, and the positive testimony of complainant, unequivocally denying the execution of the contract, and considering all the testimony directly bearing upon this point, without reference to collateral testimony on other points in the case, and I think, to any candid, unprejudiced mind, accustomed to consider evidence, and able to appreciate the relation of one set of facts to another, it will appear to be in the highest degree improbable that this signature to the alleged marriage contract is the genuine signature of the complainant; and, whether the signature be genuine or not, still more improbable that it was subscribed to the alleged contract after it was written. It further seems highly improbable that respondent should have confided so important a secret as the marriage contract to such persons as the two colored women, Mrs. Pleasant and Martha Wilson, to Vesta Snow, and Nellie Brackett, and have concealed it from her brother, uncle, aunt, and other much more reputable friends, having a far greater interest in her welfare. It is also highly improbable that her counsel would have failed to call her friends, and, at least, offer to show their knowledge of the contract, as a part of the *res gestæ*, had it been exhibited to them, or had any knowledge of its existence ever been brought to their notice. Their absence from the witness-stand, and from any sort of connection with this trial, is extremely significant. Counsel for respondent were not at all backward in offering, and vehemently pressing upon the attention of the court, any testimony supposed to be favorable to their client's cause. This failure by her to produce the contract for the inspection of respondent's friends, as a vindication of her conduct, which caused them great uneasiness, raises a violent presumption that it was not at the time in existence, and gives rise to a further strong improbability that the contract is genuine.

The discussion of the "Dear Wife" letters I shall leave wholly to my associate.

While section 75 authorizes the making of a "declaration of marriage" substantially in the form of the one in question, section 77 makes the positive additional provision that "declarations of marriage *must be acknowledged and recorded* in like manner as grants of real property." There is no exception. The declaration in question is neither acknowledged nor recorded, and in this important particular fails to conform to the statute. If the parties had the Code before them when this contract was drawn up, as stated, this provision, being on the same page, could not have escaped attention. It provides certain means of proof which public policy demands in matters so important to the interests of society. There surely could be no good reason for not having it acknowledged, even if it was not desirable to record it. There would then have been valid proof on its face of its genuineness. The fact that the declaration is neither acknowledged nor recorded, as is expressly required by the very statute under which it purports to have been executed, raises an implication against its genuineness, and affords another improbability that it was drawn and executed in the manner alleged by respondent. Surely, when the statute itself provides for, and in the most positive, mandatory terms requires, the evidence of the genuineness of the instrument indicated, it is not too much for the court, in the absence of both such acknowledgment and record, to insist that the other evidence of the genuineness of so extraordinary a contract of marriage should be of the most indubitable and satisfactory character.

To recapitulate the results thus briefly suggested by the evidence more fully elucidated by my associate: We start with a direct irreconcilable contradiction between the complainant and respondent as to the execution of the alleged marriage contract, one affirming and the other denying its execution, and the point to be determined is, which is right? Conceding the parties *prima facie* to stand upon an equal footing as to character for truth and veracity, the question of veracity between them must be determined from the other evidence in the case. There is no other direct evidence upon the principal fact in issue, and we cannot know, absolutely, where the truth lies. The scale must therefore be turned by the intrinsic probabilities arising out of the known facts, considered in their relations to all the other evidence in the case, and all collateral facts disclosed, from which the truth may be inferred.

We have, then, these several enumerated improbabilities, contradictions, and other circumstances fairly suggested by the evidence:

(1) The improbability that complainant, a man of experience, of known intelligence, reared with ideas such as prevail in this country upon the subject, should enter into so extraordinary a contract, in the extraordinary way indicated, with honorable intentions, without a stronger motive than any suggested for departing from the ordinary course in entering into matrimonial alliances; and the greater improbability that he should do it with the basest and most infamous

purpose of deceiving, and thereby ruining, the respondent. Such infamous acts should not be attributed to him against his unqualified, positive denial, except upon evidence clearly satisfactory.

(2) The improbability that an honorable and virtuous woman, of the respondent's intelligence, spirit, and experience in the ways of the world, in easy pecuniary circumstances, as she claimed to be, of respectable connections and good social position, upon so short an acquaintance of so exceptional a character, without consulting her brother,—one who manifested so much interest in her welfare,—or other near relatives and friends, should enter clandestinely into so extraordinary a contract, in so extraordinary a manner.

(3) Had there been executed a contract of the character alleged, in the extraordinary manner stated, the improbability that both or either of the parties would, or even could, have conducted themselves with respect to each other in the way we know they did during the month, or nearly the whole month, following the execution of the contract,—a course of conduct wholly at variance with our experience of human action, and the influence and operation of human affections and human passions.

(4) The improbability that respondent would fail to make her marriage contract, if any there were, public for two years after its repudiation by complainant, who, having violated and repudiated the whole contract himself, could no longer expect respondent to comply with its requirements; and the further great improbability that after her expulsion from the Grand Hotel, and for a year after the time prescribed for secrecy had expired, she would neglect to make the contract public, and claim her rights under it; especially so, where the ignominious position in which the respondent was placed called loudly for publicity; and the still further improbability that a proud-spirited and resolute woman, like respondent, would quietly submit and suffer in silence, under the circumstances of contumely in which she was placed.

(5) The improbability that the private correspondence of a husband with his wife, intended for no eye but her own, should generally be addressed, inside, to her by her maiden name, and in no instance manifest any of the sentiments which would be expected in letters from a husband to his wife, and, in the few instances in which he is claimed to have addressed her as "My Dear Wife," the word "wife" should be the only one in the letter indicative of that relation, and be inconsistent in tone and matter with every other part of the letter.

(6) The improbability that, during all the three years next succeeding the date of the alleged contract, there should be no letter addressed by respondent to complainant, and no authentic instance of a verbal communication between them wherein respondent should address complainant as husband; no instance where there would be some claim or intimation that she considered herself as the wife of

complainant, or in which some sentiment or thought should be expressed, from which it can be inferred that she entertained the idea of wifehood, while a number of letters are shown—in fact, all in evidence—which, in matter and form, are wholly inconsistent with the idea that she considered herself the wife of complainant.

(7) The improbability that during the time of a cordial and harmonious cohabitation as husband and wife, if such there was, the parties should at all times deal with each other, in money matters, at arms-length, and account together from time to time, balancing to a cent on the apparent basis of $500 a month allowance, and that out of this pitifully small sum, comparatively speaking, the wife of a man of so great wealth should be required to pay all her expenses, rent of rooms to live in, hotel bills, clothing, ornaments, and other personal expenses incident to a lady in good society, when that husband had, before marriage, offered to respondent double the allowance to live with him in another capacity, of less respectable character.

(8) The improbability that respondent's important and vital secret should be confided to such parties as Mrs Pleasant, Martha Wilson, and Vesta Snow, whose positions, in the most favorable aspects in which they can be viewed in connection with the circumstances developed in the testimony, are, at least, equivocal, and have been concealed from her brother, who had theretofore been to her all that a brother could be to a sister, and who remonstrated with her against her association with complainant; also from her uncle, who had manifested so great an interest in her as to threaten physical punishment to complainant; from her aunt and her husband, and respondent's other relations and friends, and under the circumstances of ignominy in which she was placed, if revealed to them, that they, or she herself, should have concealed it so long from the public.

(9) The great probability, from the appearance of the alleged contract, and the intrinsic evidence disclosed on its face, that it was written after the writing of the signature, and after the paper had been folded; and the further great probability appearing from a comparison of the signatures to the alleged contract with numerous genuine signatures of complainant, and from a consideration of all the testimony bearing upon the point that the signature was not, in fact, written by complainant.

(10) The great probability that respondent's veracity cannot be relied on, from the fact that respondent is substantially contradicted by Dobinson as to there being books of the kind she mentions at the time of the alleged execution of the marriage contract in the office of complainant, by other credible witnesses as to the date of the opening of Martha Wilson's restaurant, and that she is directly contradicted as to the numerous acts performed and declarations made by her in 1880, 1881, and 1882, about which neither can be mistaken, wholly inconsistent with the idea that at that time she supposed she was the wife of complainant, by Mrs. Morgan, Mrs. Millett, Mrs.

Kenyon, Mrs. Bacon, and Mrs. Brackett, thereby discrediting her testimony on material points; also, the improbability arising out of the unsatisfactory character of the testimony given by respondent, and the unsatisfactory tone and manner in which it was given.

(11) The improbability as to its genuineness arising from the fact that the alleged declaration of marriage was not "acknowledged and recorded in like manner as grants of real property," as is expressly required that it should be by section 77 of the Civil Code.

(12) Secrecy is always, as we have seen, and especially in matters which the good of society and public policy require to be made public, a badge of suspicion and fraud  The secret acts of the parties in this case are *indicia* of meretricious, and not marital, relations, and give rise to a further probability that there was no genuine marriage contract.

Without going over the particulars of the evidence so ably and satisfactorily discussed by my associate, I find these intrinsic improbabilities, probabilities, and these other weighty considerations disclosed in the case, to be opposed to the testimony of respondent; and I am wholly unable, on the other hand, to find any sufficient deductions from the testimony in the case to counterbalance them.  In my judgment, the weight of the evidence, even as presented in the case, without an inspection by the court of the original documents, largely preponderates in favor of the complainant, and satisfactorily establishes the forgery and the fraudulent character of the instrument in question.

It would have been far more satisfactory to the court if the original documents themselves had been introduced in evidence, instead of mere photographic copies, or if the court could have been permitted to inspect the originals; but this could not be done without compulsion, or upon such conditions as respondent and her counsel themselves saw fit to prescribe, and to which the court could not submit. We have done the best we could, in view of the disadvantages under which we labored, in this particular, and if the respondent has suffered from a want of inspection of the originals by the court, and nearly all the witnesses,—all except the witness Piper,—it is the result of her own and her counsel's acts.  The inference that must be drawn from withholding an inspection is that their production would be injurious to respondent's case, and this inference only makes more certain the correctness of our conclusion, which is sufficiently obvious without its aid.

I am satisfied, after a most laborious and careful consideration of the evidence, that the instrument in question, the so-called "Dear Wife" letter in ink, and the other "Dear Wife" letters, the latter at least as to the word "wife," are not genuine; that they are forged and fraudulent; and that the alleged declaration of marriage set out in the bill ought to be canceled and annulled as a forgery and a fraud.

The analysis of the evidence by my associate is so searching, ex-

haustive, and satisfactory, and his reasoning so convincing, that no further discussion can be desired. I feel that I can add nothing of interest, or that will give additional force, to the argument, and but for the great importance of the case, and the wide-spread public interest manifested in it, I should have remained silent. Without further observations, therefore, I concur in the conclusions on the *material* points reached, in the line of reasoning by which they are established, and in the decree ordered.

As the case was argued and submitted during the life-time of complainant, who has since deceased, the decree will be entered *nunc pro tunc*, as of September 29, 1885, the date of its submission, and a day prior to the decease of complainant.